IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10874

_____

D.C. Docket No. 1:15-cr-20621-FAM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL ST. HUBERT,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

Before ED CARNES, Chief Judge, TJOFLAT, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, and BRANCH, Circuit Judges.[*]

_____

[*] Judge Grant did not participate in the decision to rehear this case en banc. Judge Julie Carnes participated in the en banc poll that was conducted in this case before taking senior status on June 18, 2018.

BY  THE  COURT:

A member of this Court in active service having requested a poll on whether this case should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting a rehearing en banc, it is ORDERED that this case will not be reheard en banc.

TJOFLAT, Circuit Judge, joined by ED CARNES, Chief Judge, and WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges, concurring in the denial of rehearing en banc.

Two dissents—those by Judges Wilson and Martin—have seized upon this direct appeal case as an opportunity to criticize our Court's processing and publishing of orders on federal prisoners' applications to file successive motions under 28 U.S.C. § 2255(h). Those dissents not only distort the factual context but also contain unfounded attacks on the integrity of the Court as an institution. So, regrettably, a response is required to set the record straight.

These two dissents focus on only prisoners' post-conviction applications to file successive § 2255 motions. To place the subject matter of the dissents in context, it is necessary to describe first (1) the nature of the instant direct-appeal case and (2) how, after a direct appeal, a federal prisoner has yet another post-conviction opportunity to challenge his sentence through an initial 28 U.S.C. § 2255 motion. Second, I explain how Congress has strictly limited prisoners' applications to file successive § 2255 motions that seek to challenge yet again a federal conviction and sentence that has long since become final.

Third, to correct the record about our Court's published orders ruling on such applications, I provide the statistics that show how our Court has published only 1 to 2% of its orders on post-conviction applications to file successive § 2255 motions, even in 2016, the year on which the dissenters focus. Lastly, contrary to

3

what the dissents claim, I discuss how all published orders of this Court are always subject to further review, such as the en banc poll in this very case. As explained below, there simply isn't (nor has there ever been) any crisis about our Court's published orders.

## I. INSTANT CASE IS DIRECT CRIMINAL APPEAL

Let's start with what type of proceeding the instant case is and is not. This criminal case is a direct appeal, wherein the appellant-defendant St. Hubert challenges his two federal firearm convictions under 18 U.S.C. § 924(c). St. Hubert has never disputed that he had and brandished a firearm while robbing an AutoZone store on January 21, 2015, and while attempting to rob another AutoZone store on January 27, 2015. *United States v. St. Hubert*, 909 F.3d 335, 338–40 (11th Cir. 2018).

Rather, St. Hubert contends that his admitted Hobbs Act robbery crimes do not qualify as predicate "crimes of violence" under § 924(c)(3)'s definitions. *Id.* at 340. After briefing and oral argument, a panel of this Court affirmed St. Hubert's firearm convictions, concluding his predicate armed robbery offenses qualify as crimes of violence under § 924(c)(3)'s residual and elements clauses. *See id.* at 344–53. In affirming, the *St. Hubert* panel followed, in part, this Court's binding precedent in *In re Saint Fleur*, 824 F.3d 1337, 1340–41 (11th Cir. 2016), which

held that Hobbs Act robbery qualifies as a crime of violence under 18 U.S.C. § 924(c)(3)(A)'s elements clause. *St. Hubert*, 909 F.3d at 345–46.

In doing so, our *St. Hubert* panel pointed out that five other circuits, like our *In re Saint Fleur* published order, had held that Hobbs Act robbery is a crime of violence under § 924(c)(3)(A)'s elements clause. *United States v. Barrett*, 903 F.3d 166, 174 (2d Cir. 2018), *petition for cert. filed*, No. 18-6985 (U.S. Dec. 11, 2018); *United States v. Melgar-Cabrera*, 892 F.3d 1053, 1064–66 (10th Cir.), *cert. denied*, 139 S. Ct. 494 (2018); *Diaz v. United States*, 863 F.3d 781, 783–84 (8th Cir. 2017); *United States v. Gooch*, 850 F.3d 285, 291–92 (6th Cir.), *cert. denied*, 137 S. Ct. 2230 (2017); *United States v. Rivera*, 847 F.3d 847, 848–49 (7th Cir.), *cert. denied*, 137 S. Ct. 2228 (2017). Since that time, two other circuits have held the same. *United States v. Bowens*, 907 F.3d 347, 353–54 (5th Cir. 2018), *petition for cert. filed*, No. 18-7612 (U.S. Jan. 28, 2019); *United States v. Garcia-Ortiz*, 904 F.3d 102, 106–09 (1st Cir. 2018), *petition for cert. filed*, No. 18-7176 (U.S. Dec. 27, 2018). As to Hobbs Act robbery, our Court is simply not an outlier.

In addition to direct appeals like this case, a federal prisoner has a second post-conviction opportunity to challenge his sentence by timely filing an initial § 2255 motion in the district court. Section 2255(a) provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such

5

sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). If the district court denies the initial § 2255 motion, the federal prisoner may directly appeal that ruling to this Court. *Id.* § 2255(d).

In short, as important factual context, the dissents do not address, or complain about, direct appeals or initial § 2255 motions, whereby a federal prisoner already has had two post-conviction opportunities to challenge his sentence. Rather, the dissents ignore those two avenues of redress and are using this direct-appeal case as a vehicle to write about only a third type of post-conviction proceeding: a federal prisoner's application to file a second or successive § 2255 motion pursuant to § 2255(h). I therefore turn to § 2255(h), which restricts prisoners' applications to file successive § 2255 motions.

## II. PRISONERS' APPLICATIONS TO FILE SUCCESSIVE § 2255 MOTIONS

After a federal prisoner has used his two post-conviction opportunities to challenge his sentence (through a direct appeal and an initial § 2255 motion), Congress has narrowly and significantly limited the subsequent or successive times a federal prisoner can challenge his final sentence. 28 U.S.C. § 2255(h). In the § 2255(h) statute, Congress has restricted such successive post-conviction challenges to only two types of highly circumscribed claims: (1) claims based on "newly discovered evidence that, if proven and viewed in light of the evidence as a

6

whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense"; or (2) claims based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *Id.*

Congress imposed these restrictions on successive § 2255 motions in order to achieve finality of federal criminal judgments and to stop an endless flow of post-conviction petitions by federal prisoners in the federal courts. *See Gonzalez v. Sec'y for Dep't of Corr.*, 366 F.3d 1253, 1269 (11th Cir. 2004) (en banc) ("The central purpose behind the [Antiterrorism and Effective Death Penalty Act ("AEDPA")] was to ensure greater finality of state and federal court judgments in criminal cases, and to that end its provisions greatly restrict the filing of second or successive petitions."); *see also Williams v. Warden*, 713 F.3d 1332, 1338 (11th Cir. 2013) ("Congress expressed its clear intent to impose a jurisdictional limitation on a federal court's ability to grant a habeas petitioner what is effectively a third bite at the apple after failing to obtain relief on direct appeal or in his first postconviction proceeding."); *Gilbert v. United States*, 640 F.3d 1293, 1311 (11th Cir. 2011) (en banc) ("The statutory bar against second or successive motions is one of the most important AEDPA safeguards for finality of judgment.").

Significantly here, Congress required all federal prisoners to get advance permission from a federal appellate court in order to even file a successive

7

post-conviction § 2255 motion in a federal district court.  28 U.S.C. § 2255(h) ("A second or successive motion must be certified . . . by a panel of the appropriate court of appeals . . . .").  And Congress has limited the authority of this appellate Court to grant applications only to where the prisoner's application "makes a prima facie showing that the application satisfies the requirements of [§ 2255(h)]."  *See* 28 U.S.C. §§ 2244(b)(3)(C), 2255(h).  Accordingly, as relevant here, for our Court to grant a federal prisoner's post-conviction application, the prisoner must make a prima facie showing that a new substantive rule of constitutional law retroactively applied to his case and invalidated his sentence.  *Id.*  Further, Congress has directed appellate courts to rule on such applications to file successive § 2255 motions within 30 days from the filing.  *See id.* § 2244(b)(3)(D) ("The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.").

These substantial restrictions on federal prisoners filing successive § 2255 post-conviction motions are not our rules, but Congress's statutory mandates to federal courts.  After a final judgment and an initial § 2255 post-conviction motion, there is no federal court jurisdiction to consider a successive § 2255 motion except for these two limited types of claims specified in § 2255(h).

Although Congress's statutory restrictions on federal court jurisdiction are substantial, the Supreme Court has at times, albeit not often, issued decisions that

8

ultimately fall within the scope of § 2255(h)(2).  As an example, in 2015, the U.S.

Supreme Court issued its decision in *Johnson v. United States*, which held that the

"residual clause" definition of a "violent felony" in the Armed Career Criminal Act

("ACCA") was unconstitutionally vague.  --- U.S. ---, 135 S. Ct. 2551, 2555–58,

2563 (2015).  The ACCA imposes a sentence enhancement if a convicted federal

prisoner was already convicted of three prior "violent felonies."  18 U.S.C.

§ 924(e)(1).  Thereafter, the Supreme Court in *Welch v. United States* held that

*Johnson* announced a new substantive rule that applies retroactively on collateral

review to federal sentences enhanced under the ACCA.  578 U.S. __, __, __, 136

S. Ct. 1257, 1264–65, 1268 (2016).

After *Johnson* invalidated the ACCA's residual clause and as shown by this

Court's statistics in Table 1 below, a large number of federal prisoners'

applications—2,258 applications in our Court in 2016 alone—were filed seeking

leave to file second or successive § 2255 motions based on *Johnson*'s ACCA

ruling about the residual clause.  And in 2016, our Court issued 2,282 orders on

those 2,258 applications and a few applications carried over from the end of the

prior year.

As required by Congress, the prisoners had to file in this Court before filing

in the district court and had to show a prima facie case that *Johnson* applied to

their sentences.  The Court carefully reviewed each and every individual

application. The Court determined that some of those federal prisoners who filed were not even sentenced under the ACCA, and *Johnson* did not apply to their cases at all. *See, e.g.*, *In re Griffin*, 823 F.3d 1350, 1354–56 (11th Cir. 2016) (holding that *Johnson*'s vagueness ruling does not apply to prisoners sentenced under the career offender sentencing guidelines). In its review, this Court also readily determined that other prisoners had an ACCA-enhanced sentence, but that—based on our prior Court precedent—the prisoners' prior convictions qualified as violent felonies under the ACCA's elements clause, without regard to the ACCA's residual clause invalidated in *Johnson*. *See, e.g.*, *In re Rogers*, 825 F.3d 1335, 1341 (11th Cir. 2016) (holding that, under this Court's prior precedent in *Turner v. Warden Coleman FCI (Medium)*, 709 F.3d 1328 (11th Cir. 2013), the defendant's prior Florida convictions for aggravated assault and aggravated battery qualified as violent felonies under the ACCA's elements clause); *In re Robinson*, 822 F.3d 1196, 1197 (11th Cir. 2016) (holding that, under this Court's prior precedent in *United States v. Lockley*, 632 F.3d 1238 (11th Cir. 2011), *United States v. Hill*, 799 F.3d 1318 (11th Cir. 2015) (per curiam), and *Turner*, the defendant's prior Florida convictions for armed robbery and aggravated battery qualified as violent felonies under the ACCA's elements clause).

In addition, some prisoners claimed the ACCA sentencing decisions in *Johnson* and *Welch* invalidated their sentences (or convictions) under wholly

10

separate federal statutes, such as 18 U.S.C. § 924(c) and its "crime of violence"

definition.  In those cases, this Court determined that *Johnson*'s residual clause

holding did not apply to companion § 924(c) crimes and that, even assuming

*Johnson* did, the prisoners' crimes qualified under § 924(c)'s elements clause,

which likewise was not affected by *Johnson*.  *See, e.g.*, *In re Sams*, 830 F.3d 1234,

1236, 1238–39 (11th Cir. 2016); *In re Colon*, 826 F.3d 1301, 1302–03, 1305 (11th

Cir. 2016); *In re Saint Fleur*, 824 F.3d at 1338–40.

The dissents improperly criticize our Court for publishing some of our 2,282

orders in these cases in 2016.  However, the dissents ignore that our Court

published only 31, or 1.36%, of our large volume of 2,282 orders in 2016.  In fact,

taking the five-year period from April 1, 2013 to April 1, 2018,[1] our Court

published only 1.2% of its orders in § 2255(h) applications.

To accurately show these facts, I include two tables of statistics below,

which demonstrate that this Court published a total of 45 orders from April 1, 2013

to April 1, 2018.[2]  Given the dissents primarily criticize our 2016 published orders

---

[1] This is the five-year period used in Judge Jordan's concurring opinion and Appendix. *See* Jordan, J., concurring op. at 8–9.

[2] As used in this opinion, the year is defined as April 1 of the listed year to March 31 of the subsequent year with April 1 as the applicable year date.  For consistency, Tables 1 and 2 use the same timeframe and decision dates—April 1 to March 31—as Judge Jordan's Appendix attached to his concurring opinion.  Thus, year 2013 is April 1, 2013 to March 31, 2014; year 2014 is April 1, 2014 to March 31, 2015; year 2015 is April 1, 2015 to March 31, 2016; year 2016 is April 1, 2016 to March 31, 2017; and year 2017 is April 1, 2017 to March 31, 2018.

as to applications to file successive § 2255(h) motions, Tables 1 and 2 separate the

total 45 published orders by year and category of order: either § 2255(h) or

§ 2244(b).[3]  Table 1 shows that 39 of those 45 orders were published in § 2255(h)

applications from April 1, 2013 to April 1, 2018 and that 31 of those 39 orders

were published in 2016.  Table 2 shows that only 6 of those 45 orders were

published in § 2244(b) applications from 2013 to 2018.[4]

Table 1: Number of Applications for Leave to
File Successive § 2255(h) in the Eleventh Circuit
For Years from April 1, 2013 to April 1, 2018

| Year[5] | § 2255(h) Applications | Orders of Terminations | Published | % of Published Orders |
|---|---|---|---|---|
| 2013 | 264 | 273 | 1 | 0.37% |
| 2014 | 219 | 224 | 1 | 0.45% |
| 2015 | 226 | 187 | 4 | 2.14% |
| 2016 | 2,258 | 2,282 | 31 | 1.36% |
| 2017 | 293 | 294 | 2 | 0.68% |
| **TOTAL** | **3,260** | **3,260** | **39** | **1.20%** |

---

[3] Section 2244(b) governs the filing of successive habeas corpus applications by state prisoners under 28 U.S.C. § 2254.  *See* § 2244(b).

[4] To be clear and again for consistency, the 45 total number of our Court's published orders in Tables 1 and 2 below are the same as the number of orders listed in the Appendix of Judge Jordan's concurring opinion, which accurately and helpfully lists all of this Court's published orders in both § 2255(h) and § 2244(b) applications from April 1, 2013 to April 1, 2018.  That Appendix combines them, and the tables separate the 45 published orders by category: 39 on § 2255(h) applications and 6 on § 2244(b) applications.

[5] Defined as April 1 of the listed year to March 31 of the subsequent year with April 1 as the applicable year date.  *See supra* note 2.  For context, *Welch* was decided on April 18, 2016, which explains the increased volume of § 2255(h) applications in 2016 (*i.e.*, April 1, 2016 to March 31, 2017).

Table 2: Number of Applications for Leave to
File Successive § 2244(b) in the Eleventh Circuit
For Years from April 1, 2013 to April 1, 2018

| Year | § 2244(b) Applications | Orders of Terminations | Published | % of Published Orders |
|------|------------------------|------------------------|-----------|-----------------------|
| 2013 | 344 | 336 | 1 | 0.30% |
| 2014 | 310 | 316 | 3 | 0.95% |
| 2015 | 320 | 324 | 2 | 0.62% |
| 2016 | 274 | 270 | 0 | 0.00% |
| 2017 | 283 | 290 | 0 | 0.00% |
| **TOTAL** | **1,531** | **1,536** | **6** | **0.39%** |

In 2016 after the *Johnson* and *Welch* decisions, there was a heightened need to publish at least some of these 2,282 orders to establish precedent, to provide consistency in panel rulings in so many cases, and to facilitate the administration of these matters. In some cases, it was not hard to see the right answer. In 2016, 8 of the 31 published orders in § 2255(h) cases granted the applications and 23 denied the applications.[6] Further, the dissents fail to note that in all *pro se* application cases in our Circuit, including every single application in 2016 to file a

---

All six of the published § 2244(b) orders involved death penalty cases where appellate counsel represented the defendant. Thus, we primarily focus, as the dissents do, on our published orders in § 2255(h) cases.

[6] There were also four published orders during the 2015 year (April 1, 2015 to March 31, 2016), all of which involved claims based on *Johnson*. Three of those orders denied the applications, and one order held the application in abeyance. *In re Franks*, 815 F.3d 1281 (11th Cir. 2016) (denied), *abrogation recognized by In re Robinson*, 822 F.3d at 1199; *In re Johnson*, 814 F.3d 1259 (11th Cir. 2016) (held in abeyance), *vacated*, 815 F.3d 733 (11th Cir. 2016) (en banc); *In re Starks*, 809 F.3d 1211 (11th Cir. 2016) (denied); *In re Rivero*, 797 F.3d 986 (11th Cir. 2015) (denied).

13

successive § 2255 motion, our Court's Staff Attorney's Office prepared legal memoranda addressing the *Johnson-Welch* issues and, in many cases, reviewed presentence investigation reports and sentencing transcripts.  In addition, in some prisoners' cases, there were legal memoranda filed by a federal public defender or the government or both later on.

Contrary to the dissents' criticisms, and as Table 1 demonstrates, our Court published a very small percentage of these orders ruling on applications to file successive § 2255 motions.  Although our Court published more in 2016 than in other years, largely in the wake of *Johnson* and *Welch*, the percentage still stayed exceedingly small at 1.36%.[7]  And to be clear, all of this Court's judges—including those who dissent today—have joined in these orders.

Notably too, in 2016 alone, the dissenters—as at least two members of the assigned three-judge panel (and sometimes all three members)—published 14 of their own orders on prisoners' applications to file successive § 2255 motions based on *Johnson*.  Thus, the dissenters published 14 of the 31 published orders in 2016.  That is roughly 45%.  *See In re Hunt*, 835 F.3d 1277 (11th Cir. 2016); *In re*

---

[7] We recognize, as Judge Jordan's concurring opinion aptly points out, that other circuits together have published 80 orders on successive applications in this same 5-year time frame and only 20 orders in 2016.  Jordan, J., concurring op. at 3.  The concurrence properly recommends that our Court should exercise caution in deciding to publish an order disposing of a successive § 2255 application, and "we [should] use the publication option sparingly."  *Id.* at 4.  Given our heavy caseload, Table 1 shows a 1 to 2% publication rate in 2016, which indicates we did so.

14

*Parker*, 832 F.3d 1250 (11th Cir. 2016); *In re Chance*, 831 F.3d 1335 (11th Cir.

2016), *abrogation recognized by Curry v. United States*, 714 F. App'x 968 (11th

Cir. 2018); *In re Jones*, 830 F.3d 1295 (11th Cir. 2016); *In re Gomez*, 830 F.3d

1225 (11th Cir. 2016); *In re Davis*, 829 F.3d 1297 (11th Cir. 2016); *In re Clayton*,

829 F.3d 1254 (11th Cir. 2016); *In re Sapp*, 827 F.3d 1334 (11th Cir. 2016); *In re*

*Parker*, 827 F.3d 1286 (11th Cir. 2016); *In re McCall*, 826 F.3d 1308 (11th Cir.

2016); *In re Rogers*, 825 F.3d 1335 (11th Cir. 2016); *In re Adams*, 825 F.3d 1283

(11th Cir. 2016); *In re Pinder*, 824 F.3d 977 (11th Cir. 2016); *In re Robinson*, 822

F.3d 1196 (11th Cir. 2016).

Before that, in 2015, there were only four published orders in such § 2255(h)

applications, yet the dissenters, as at least two members of the assigned three-judge

panel, published two of those four orders—50% that year.[8]  *In re Johnson*, 814

F.3d 1259; *In re Starks*, 809 F.3d 1211.

None of the dissents tell the reader this full story.[9]

---

[8] *See supra* notes 4 and 6.

[9] This is not the first time these dissenters have voiced criticisms of the judges of this Court as to its published orders and rulings on *Johnson*-based claims.  For example, the dissenters themselves recently published an order denying a state prisoner's application for leave to file a successive § 2254 habeas petition, in which the petitioner argued he had received ineffective assistance of counsel.  *See In re Williams*, 898 F.3d 1098 (11th Cir. 2018).  The dissenters attached to that order separate "concurrences" (that are similar to the dissents in this case) even though the *In re Williams* case had nothing to do with *Johnson*, *Welch*, or federal prisoners' successive § 2255 motions.  *Id.* at 1099–1105 (Wilson, J., specially concurring); *id.* at 1105–10 (Martin, J., specially concurring).  These concurrences also omit critical background facts, as do other opinions that the dissenters have filed in recent years.  *See, e.g.*, *United States v. Seabrooks*, 839 F.3d 1326, 1349–50 (11th Cir. 2016) (Martin, J., concurring in the judgment);

15

### III. PUBLISHED PANEL ORDERS AS BINDING CIRCUIT PRECEDENT

Having placed this subject matter in context, I now turn to the dissents' attacks on our Court's rule: that published panel orders are binding precedent under our prior panel precedent rule.

First, that published panel orders are binding precedent is not a new rule. *See In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) ("To be clear, our prior-panel-precedent rule applies with equal force as to prior panel decisions published in the context of applications to file second or successive petitions. In other words, published three-judge orders issued under § 2244(b) are binding precedent in our circuit."); *United States v. Kaley*, 579 F.3d 1246, 1255–56 (11th Cir. 2009) (applying *In re Provenzano*, 215 F.3d 1233 (11th Cir. 2000), a published three-judge order); *In re Provenzano*, 215 F.3d at 1235 (applying as binding prior-panel precedent *In re Medina*, 109 F.3d 1556 (11th Cir. 1997), a published three-judge order); *see also In re Hill*, 777 F.3d 1214, 1222–23 (11th Cir. 2015) (applying as binding precedent *In re Henry*, 757 F.3d 1151 (11th Cir. 2014), a published three-judge order); *St. Hubert*, 909 F.3d at 346 (concluding our Circuit already considers published three-judge orders as binding precedent).

---

*In re Clayton*, 829 F.3d at 1263–67 (Martin, J., concurring in the result); *In re McCall*, 826 F.3d at 1311–12 (Martin, J., concurring); *In re Saint Fleur*, 824 F.3d at 1341–44 (Martin, J., concurring). It is now time for a response.

Second, the dissenters incorrectly state that our Court's published orders are insulated from further review.  Contrary to the dissents, no published panel order in any case in our Court is insulated from further review.

For example, whenever a panel publishes an order in any case in our Court, any one of the active members of this Court can *sua sponte* request an en banc poll in the exact same case asking that the published order be vacated and the case be heard en banc.  *See Lambrix*, 776 F.3d at 794; *see also In re Johnson*, 815 F.3d 733, 733 (11th Cir. 2016) (en banc) (granting rehearing en banc in a successive application case after a member of this Court requested a poll); *In re Morgan*, 717 F.3d 1186, 1187 (11th Cir. 2013) (en banc) (denying rehearing en banc in a successive application case after a member of this Court requested a poll); 11th Cir. R. 35, I.O.P. 5 ("Any active Eleventh Circuit judge may request that the court be polled on whether rehearing en banc should be granted whether or not a petition for rehearing en banc has been filed by a party.").  If the majority of the active judges vote to do so, this Court sitting en banc *sua sponte* can vacate that published panel order and rehear that same case.  *See In re Johnson*, 815 F.3d at 733; 11th Cir. R. 35-10 ("[T]he effect of granting a rehearing en banc is to vacate the panel opinion and the corresponding judgment.").  The real problem for the dissenters, it seems to me, is that they have not garnered the majority votes needed to vacate the particular published panel orders with which they disagree.

17

In addition, each and every subsequent case following that initial published order provides a second avenue of review. This direct appeal in St. Hubert's case aptly illustrates this second available avenue of review of binding precedent established in a published panel order.

Here, the *St. Hubert* panel relied on our binding precedent in *In re Saint Fleur*, a published panel order. *St. Hubert*, 909 F.3d at 345–46 (following *In re Saint Fleur*'s holding that Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause, and thus Saint Fleur's sentence was valid even if *Johnson* rendered § 924(c)(3)(B)'s residual clause unconstitutional). Every time a panel applies this *In re Saint Fleur* precedent (as the *St. Hubert* panel did here), any active member of the Court can ask for en banc review of that *In re Saint Fleur* precedent established in our Court's published panel order. Such an en banc poll was taken in this very case. Simply put, our Circuit law established in published panel orders, such as the *In re Saint Fleur* precedent, is subject to an en banc poll request each and every time it is applied in a subsequent case (like St. Hubert's).

Again, the problem for the dissenters is that the law established in the *In re Saint Fleur* published order is sound, and thus the dissenters have been unable to garner the majority votes needed to change that *In re Saint Fleur* precedent by taking *St. Hubert* en banc. Moreover, after our Court's *In re Saint Fleur* published

18

order in 2016, at least seven of our sister circuits have reached the same holding

that Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s

elements clause. *See Bowens*, 907 F.3d at 353–54; *Garcia-Ortiz*, 904 F.3d at 106–

09; *Barrett*, 903 F.3d at 174; *Melgar-Cabrera*, 892 F.3d at 1064–66; *Diaz*, 863

F.3d at 783–84; *Gooch*, 850 F.3d at 291–92; *Rivera*, 847 F.3d at 848–49.[10]

One dissent also points to, and criticizes by name, eight published orders by

our Court from 2016 to 2018 about what constitutes a violent felony under the

ACCA or a crime of violence under § 924(c). *See* Martin, J., dissenting at 14. But

as Table 1 above makes obvious, this is a byproduct of the large number of cases

that required and received our attention in 2016 to 2018. Surely, the number of

published panel orders in 2016 to 2018 should be placed in the context of our 2016

to 2018 caseload in this regard.

It also bears mentioning that since we published these eight orders, other

circuits have reached the same conclusions as many of them about what constitutes

a violent felony or a crime of violence. For example, in *In re Hines*, 824 F.3d

1334, 1336–37 (11th Cir. 2016), cited in Judge Martin's dissent on page 19, this

Court held that armed federal bank robbery under 18 U.S.C. § 2113(a) and (d)

qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause. In *In re*

---

[10] Indeed, in this instant direct appeal case, the panel has not only followed *In re Saint Fleur*, but also has taken time to expand upon why Hobbs Act robbery qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause. *See St. Hubert*, 909 F.3d at 345–51.

19

*Sams*, 830 F.3d at 1239, this Court further held that bank robbery solely under § 2113(a) qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause.

Like *In re Hines* and *In re Sams*, nine other circuits have held that companion federal convictions for bank robbery under § 2113(a) or armed bank robbery under § 2113(a) and (d) qualify as either violent felonies under the ACCA's elements clause or as crimes of violence under the elements clauses of § 924(c) or U.S.S.G. § 4B1.2(a).  *See United States v. Deiter*, 890 F.3d 1203, 1210–13 (10th Cir. 2018) (holding bank robbery under § 2113(a) is a violent felony under the ACCA's elements clause); *United States v. Harper*, 869 F.3d 624, 625–27 (8th Cir. 2017) (holding bank robbery under § 2113(a) is a crime of violence under § 4B1.2(a)'s elements clause); *United States v. Brewer*, 848 F.3d 711, 713–16 (5th Cir. 2017) (same); *United States v. McBride*, 826 F.3d 293, 295–96 (6th Cir. 2016) (same); *United States v. Johnson*, 899 F.3d 191, 203–04 (3d Cir. 2018) (holding that both bank robbery and armed bank robbery qualify as crimes of violence under § 924(c)'s elements clause); *United States v. Watson*, 881 F.3d 782, 784–86 (9th Cir. 2018) (same); *Hunter v. United States*, 873 F.3d 388, 390 (1st Cir. 2017) (same); *United States v. Armour*, 840 F.3d 904, 907–09 (7th Cir. 2016) (same); *United States v. McNeal*, 818 F.3d 141, 151–57 (4th Cir. 2016) (same).

Similarly, in *In re Smith*, 829 F.3d 1276, 1280 (11th Cir. 2016), also cited in Judge Martin's dissent on page 19, this Court held that federal carjacking under 18

U.S.C. § 2119 qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause. Four other circuits have likewise held that federal carjacking under § 2119 qualifies as a crime of violence under § 924(c)(3)(A)'s elements clause. *See United States v. Cruz-Rivera*, 904 F.3d 63, 66 (1st Cir. 2018); *United States v. Gutierrez*, 876 F.3d 1254, 1255–57 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1602 (2018); *United States v. Jones*, 854 F.3d 737, 740–41 & n.2 (5th Cir.), *cert. denied*, 138 S. Ct. 242 (2017); *United States v. Evans*, 848 F.3d 242, 246–48 (4th Cir.), *cert. denied*, 137 S. Ct. 2253 (2017).

The judges of this Court may have valid differences of opinion about the legal issues involving the ACCA's definition of a violent felony or § 924(c)'s definition of a crime of violence, as discussed in these 31 published orders during 2016 and the 4 published orders during 2015. However, it is incorrect to say, as the dissents do, that binding precedent established in published panel orders of this Court, like *In re Saint Fleur*, are insulated from all further review. In the wake of *Johnson* and *Welch*, the judges of this Court and the Court's dedicated staff attorneys and law clerks worked long hours faithfully reviewing and considering 2,282 prisoners' applications in 2016 alone. This concurrence is done to afford the

21

needed context to the process and our Court's having published 31 orders on those applications to file successive § 2255 motions in 2016.[11]

For all of these reasons, I concur in this Court's denial of rehearing en banc (1) as to whether Hobbs Act robbery qualifies as a crime of violence under § 924(c)'s definitions and (2) as to our Court's rule that published panel orders constitute binding precedent.[12]

---

[11] In a similar vein, the dissenters have attacked our decisions ruling that *Johnson* applied to the ACCA but not to the advisory sentencing guidelines. *See In re Hunt*, 835 F.3d at 1278–80 (Wilson, J., concurring), 1280–84 (Rosenbaum, J., concurring), 1284–89 (Jill Pryor, J., concurring); *In re Anderson*, 829 F.3d 1290, 1294–97 (11th Cir. 2016) (Martin, J., dissenting); *In re Clayton*, 829 F.3d at 1257–64 (Martin, J., concurring), 1267–70 (Rosenbaum, J., concurring), 1274–76 (Jill Pryor, J., concurring); *In re McCall*, 826 F.3d at 1310–11 (Martin, J., concurring); *In re Robinson*, 822 F.3d at 1198 n.2 (Martin, J., concurring); *United States v. Matchett*, 802 F.3d 1185, 1193–96 (11th Cir. 2015).

Despite these criticisms, the Supreme Court in *Beckles v. United States*, 580 U.S. __, __, 137 S. Ct. 886, 890 (2017), ultimately held, as we have, that *Johnson* does not apply to the advisory sentencing guidelines. Sometimes there is disagreement between judges about legal issues, but that should not give rise to the unfounded accusations in some of the dissents in the last few years about our rulings on applications to file successive motions.

[12] Judge Martin's dissent at pages 5-6 criticizes the "stacking" of St. Hubert's two § 924(c) sentences in South Florida. St. Hubert was sentenced to 7 years on his first § 924(c) conviction for using a firearm during a January 21 robbery and to the statutory mandatory consecutive 25 years on his second § 924(c) conviction for using a firearm during a January 27 robbery. *See St. Hubert*, 909 F.3d at 339–40.

The dissent fails to mention that St. Hubert was indicted for 13 crimes, including six separate § 924(c) firearm crimes, five separate armed robberies, and one attempted armed robbery between December 23, 2014, and January 27, 2015. *Id.* In exchange for St. Hubert's plea to just two § 924(c) crimes, the government agreed to dismiss the 11 other counts.

WILLIAM PRYOR, Circuit Judge, respecting the denial of rehearing en banc:

Consider a hypothetical. A defendant is convicted of a federal crime and sentenced to a term of imprisonment. His conviction and sentence are affirmed on appeal. He brings a collateral challenge, *see* 28 U.S.C. § 2255(a), but it fails. Perhaps he brings more than one collateral challenge; all of them fail. Eventually, in some other case, the Supreme Court announces a new rule of law that applies retroactively to cases on collateral review. But the new rule plainly cannot benefit the prisoner—either because it does not apply to his situation or because applying it would make no difference to his conviction or sentence. Even so, he applies to this Court for permission to file a second, third, or umpteenth collateral challenge based on the new rule. Does the Antiterrorism and Effective Death Penalty Act require that we grant his application and create unnecessary work for the district court? Judge Martin's dissent appears to contend that the answer is "yes." Our Court has disagreed.

I join Judge Tjoflat's opinion in full, but I write separately to answer our colleague's challenge and to defend our commonsense practice of denying prisoners' applications to file doomed collateral challenges that cannot possibly bring them relief. The basis of our colleague's argument that denying these applications contravenes "the plain mandate" of the Act is not entirely clear. Dissenting Op. of Martin, J., at 60. Her dissent draws an insistent but far from self-

23

explanatory distinction between a "prima facie showing" and a "merits decision," and it suggests that we held in *In re Holladay*, 331 F.3d 1169 (11th Cir. 2003), that our prima facie assessment of a prisoner's application to file a second or successive collateral challenge must not touch "the merits" of the claims the prisoner wishes to raise. But we explained in *Holladay* itself—indeed, we said it was "manifestly obvious"—that we would deny applications that had no "reasonable likelihood" of resulting in relief. *Id.* at 1173. After all, whenever a circuit court denies an application for a second or successive motion, it *necessarily* decides that the application has no merit. And the circuit courts collectively deny thousands of these applications on the merits every year.

To vindicate the strong interest in the finality of fully litigated criminal convictions, the Antiterrorism and Effective Death Penalty Act imposes "stringent requirements for the filing of a second or successive [collateral challenge]," *id.* (quoting *Bennett v. United States*, 119 F.3d 468, 469–70 (7th Cir. 1997)), and, as Judge Martin's dissent acknowledges, it gives courts of appeals "a gatekeeping function" with respect to the enforcement of those requirements, Dissenting Op. of Martin, J., at 84. Before a federal prisoner may file a second or successive section 2255 motion in the district court, he must apply to "the appropriate court of appeals" for permission to do so. 28 U.S.C. § 2244(b)(3)(A); *see id.* § 2255(h)

24

(incorporating these procedures for federal prisoners). The court of appeals must then "certif[y] as provided in section 2244" that the motion will "contain—

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

*Id.* § 2255(h); *see also id.* § 2244(b)(2) (analogous requirements for state prisoners with minor differences in wording). We are permitted to authorize a second or successive challenge *only* if we "determine[] that the application makes a prima facie showing that [it] satisfies the[se] requirements." *Id.* § 2244(b)(3)(C).

Judge Martin's dissent revolves around the three words "prima facie showing," but that phrase does not interpret itself. Often, a "prima facie case" or "prima facie showing" refers to what a plaintiff must prove to shift the burden of proof or production to the defendant. *See* Dissenting Op. of Martin, J., at 69 (citing *Black's Law Dictionary* for a definition in this vein). The dissent provides as two examples the burden-shifting frameworks that govern claims of racial discrimination in jury selection, *see Batson v. Kentucky*, 476 U.S. 79 (1986), and workplace discrimination under Title VII of the Civil Rights Act, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See* Dissenting Op. of Martin, J., at 69–71. In these frameworks, "prima facie showing" has a purely formal meaning:

25

it defines the set of elements proof of which suffices to raise a presumption of liability, subject to rebuttal if the defense meets some specified burden of its own.

But this formal sense of the phrase "prima facie showing" does not fit section 2244(b)(3)(C). The statutory restrictions on second or successive collateral challenges plainly do not set up a burden-shifting framework. A prisoner's prima facie showing of compliance with section 2255(h) does not create any presumption that the government must rebut with an adequate showing of its own. Indeed, the prima facie showing does not even create a presumption of compliance with section 2255(h); the district court approaches that question *de novo*. *See In re Moss*, 703 F.3d 1301, 1303 (11th Cir. 2013). So how does our "prima facie" inspection of the prisoner's application differ from the district court's plenary assessment? The Act demands an answer to this question, but the dissent's analogies to burden-shifting frameworks do not help us find it.

When "prima facie showing" cannot bear a formal definition, it sometimes bears instead a functional meaning. For example, the Board of Immigration Appeals describes the standard for reopening of removal proceedings as requiring "a prima facie showing of eligibility" for the relief sought. *In re L-O-G-*, 21 I. & N. Dec. 413, 415 (BIA 1996); *see also Matter of Sipus*, 14 I. & N. Dec. 229, 230 (BIA 1972) (referring to "a prima facie case for reopening"). Judge Martin's dissent provides this example, *see* Dissenting Op. of Martin, J., at 71–72, but it

26

undermines the argument that "prima facie showing" has a rigid meaning that categorically excludes consideration of the merits. The Board has made clear that "[n]o hard and fast rule can be laid down as to what constitutes a sufficient showing of a prima facie case for reopening." *Sipus*, 14 I. & N. Dec. at 231; *accord L-O-G-*, 21 I. & N. Dec. at 418 ("[T]here are no easy rules for deciding what makes a prima facie case . . . and what does not.").

Instead, in this context, a prima facie showing is simply whatever "satisf[ies] [the Board] that it would be worthwhile to develop the issues further at a plenary hearing on reopening." *Sipus*, 14 I. & N. Dec. at 231. This standard is not blind to the merits. On the contrary, it *requires* "a reasonable likelihood of success on the merits" in the judgment of the Board, and, under this standard, the Board has denied motions for reopening for a variety of merits-related reasons. *L-O-G-*, 21 I. & N. Dec. at 420.  For example, in *Sipus*, the movant's "new facts" were plainly inadequate to support eligibility for relief, so the Board could not "infer . . . that she [might] be able to prove [eligibility] if given a chance at a reopened hearing." 14 I. & N. Dec. at 231. The Board has also denied a motion for reopening based on its discretionary determination in the first instance that the movant had been convicted of "a particularly serious crime," making him legally ineligible for relief. *In re S-V-*, 22 I. & N. Dec. 1306, 1309 (BIA 2000), *disapproved on other grounds by Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006).

27

In the foundational decision about section 2244(b)(3)(C), the Seventh Circuit interpreted it to include a similar "worthwhileness" standard: "By 'prima facie showing' we understand . . . simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Bennett*, 119 F.3d at 469. The Seventh Circuit made clear that this definition did not treat "prima facie showing" as a legal term of art with a formal meaning because it was articulated "without guidance in the statutory language or history or case law." *Id.* In *Holladay*, we adopted this language from *Bennett*, *see* 331 F.3d at 1173–74, and every other numbered circuit has done the same. *See Rodriguez v. Superintendent, Bay State Corr. Ctr.*, 139 F.3d 270, 273 (1st Cir. 1998); *Bell v. United States*, 296 F.3d 127, 128 (2d Cir. 2002); *Goldblum v. Klem*, 510 F.3d 204, 219 (3d Cir. 2007); *In re Williams*, 330 F.3d 277, 281 (4th Cir. 2003); *Reyes-Requena v. United States*, 243 F.3d 893, 899 (5th Cir. 2001); *In re Lott*, 366 F.3d 431, 432–33 (6th Cir. 2004); *Johnson v. United States*, 720 F.3d 720, 720 (8th Cir. 2013); *Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997); *United States v. Murphy*, 887 F.3d 1064, 1068 (10th Cir. 2018).

Although Judge Martin's dissent invokes the *Bennett-Holladay* standard to lament the supposed good old days "when this Court honored the statutorily imposed limitations of a prima facie review," Dissenting Op. of Martin, J., at 73, the Seventh Circuit in *Bennett* did not describe its definition as especially

28

permissive or as one that required courts of appeals to close their eyes to the impossibility of relief. On the contrary, when Donald Bennett sought permission to file a third section 2255 motion under the "newly discovered evidence" gateway for successive motions, *see* 28 U.S.C. § 2255(h)(1), the *Bennett* court stressed that he bore a "very heavy burden" of "ha[ving] to show, albeit only prima facie, that the newly discovered evidence would have established [his innocence] by clear and convincing evidence," and it denied his application because the evidence he relied on was plainly inadequate. 119 F.3d at 469. In part, Bennett's burden was especially heavy because he wanted to relitigate an insanity defense that itself required clear and convincing proof, so his burden of proof was clear-and-convincing squared. *See id.* But *Bennett* makes clear that a court of appeals' "prima facie" inspection of an application under section 2255(h) does not require it to close its eyes to the merits altogether. After all, how could "a fuller exploration" be "warrant[ed]," *id.*, when it would serve only to waste the district court's time and be of no use to the prisoner?

Perhaps our colleague would limit the *Bennett* court's willingness to acknowledge that a motion is certainly doomed to the "newly discovered evidence" gateway, but she cannot take that position and eulogize *Holladay* at the same time because *Holladay* followed the same approach with respect to the "new rule" gateway, 28 U.S.C. § 2255(h)(2); *see also id.* § 2244(b)(2)(A). When Alabama

death-row inmate Glenn Holladay sought leave to file a second federal habeas petition based on the Supreme Court's novel holding that the Constitution bars the execution of the mentally retarded, *see Atkins v. Virginia*, 536 U.S. 304 (2002), we held that *Atkins* provided a retroactive new rule of constitutional law, but "[i]mportantly" that holding "[did] not terminate our analysis." 331 F.3d at 1173. Describing the identification of a new rule as "merely . . . the minimum showing that [a petitioner] must make," we held that it was "manifestly obvious that in order to make a *prima facie* showing" based on *Atkins*, "Holladay also must demonstrate . . . a reasonable likelihood that he [was] in fact mentally retarded." *Id.*; *accord In re Morris*, 328 F.3d 739, 740–41 (5th Cir. 2003); *In re Bowling*, 422 F.3d 434, 436 (6th Cir. 2005). "Were it otherwise," we reasoned, "literally any prisoner under a death sentence could bring an *Atkins* claim in a second or successive petition," and "[n]o rational argument can possibly be made" that the Act requires us to permit the inundation of the district courts with wholly meritless second or successive collateral challenges every time the Supreme Court announces a new rule. *Holladay*, 331 F.3d at 1173 n.1.

Under *Holladay*'s sensible regime, a prisoner cannot discharge his prima facie burden merely by invoking a new rule; as we phrased the standard in a later decision, he must also "show a reasonable likelihood that he would benefit from the new rule he seeks to invoke in a second or successive [challenge]." *In re*

30

*Henry*, 757 F.3d 1151, 1162 (11th Cir. 2014); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (distinguishing legal conclusions in a complaint from the "show[ing]" of entitlement to relief required by Federal Rule of Civil Procedure 8(a)(2)). To put it tersely, the prisoner must show that the new rule has some "bearing on his case." *Henry*, 757 F.3d at 1162.

Judge Martin may disagree with *Holladay*—as the Tenth Circuit did in a decision that her dissent cites favorably, *see Ochoa v. Sirmons*, 485 F.3d 538, 545 (10th Cir. 2007)—but in that case she should not invoke its authority while rejecting its rule, which we applied in all of the orders to which her dissent takes exception. *See* Dissenting Op. of Martin, J., at 75–77. For example, a prisoner whose sentence under the Armed Career Criminal Act "does not turn on the validity of the residual clause," *In re Thomas*, 823 F.3d 1345, 1349 (11th Cir. 2016), is a prisoner who cannot possibly benefit from the Supreme Court's holding that the residual clause is unconstitutionally vague, *see Johnson v. United States*, 135 S. Ct. 2551 (2015). So is a prisoner whose conviction for carrying a firearm during and in relation to a crime of violence, 18 U.S.C. § 924(c), or whose sentence under the former career-offender sentencing guideline, United States Sentencing Guidelines Manual §§ 4B1.1–4B1.2 (Nov. 2015), would stand whether or not *Johnson* affects section 924(c) or the career-offender guideline. In declining to permit "literally any prisoner under [an Armed Career Criminal Act, section

31

924(c), or career-offender] sentence [to] bring a[] [*Johnson*] claim in a second or successive petition," *Holladay*, 331 F.3d at 1173 n.1, we have not "exceeded [our] statutory mandate," Dissenting Op. of Martin, J., at 74. Instead, we have *executed* our statutory mandate as we interpreted it in *Holladay*, which, as the dissent reminds us, "is still binding precedent for our Circuit." *Id.* at 73.

The logic of *Holladay* exposes any rigid dichotomy between a prisoner's "prima facie showing" and "the merits" of his claim as untenable. True, whether *Johnson* or any other new rule that a prisoner invokes really supports his claim is a question that relates to "the merits." But it is no less true that a prisoner's prima facie showing must include the demonstration that his motion will "contain," 28 U.S.C. § 2255(h)(2), or "rel[y] on," *id.* § 2244(b)(2)(A), a new rule of constitutional law, and that requirement demands more than that the prisoner write the magic word "*Johnson.*" If a new rule plainly does not apply to a prisoner's situation or applying it would make no difference to his conviction and sentence, then he necessarily cannot "show a reasonable likelihood that that he would benefit from the new rule," and his application fails at the starting gate for the same reason his collateral challenge would fail on the merits. *Henry*, 757 F.3d at 1162. So it is no wonder that we and other courts have frequently referred to "the merits" in asking whether an application satisfies section 2255(h). *See, e.g.*, *In re Baptiste*, 828 F.3d 1337, 1340 (11th Cir. 2016) (calling the denial of a previous application

32

raising the same claim a "reject[ion] on the merits"); *Henry*, 757 F.3d at 1157 n.9 ("As the dissenting opinion sees the case, Henry should be entitled to file a second or successive petition under § 2244(b)(2) because he's made a sufficient merits showing."); *id.* at 1169 (Martin, J., dissenting) ("I must also address the merits of Mr. Henry's case."); *id.* at 1170 ("I view the merits . . . differently than the Majority."); *Ezell v. United States*, 778 F.3d 762, 765 (9th Cir. 2015) ("reach[ing] the merits" of a prisoner's application for leave to file a second or successive motion).

There is nothing remotely strange about this partial overlap between a threshold inquiry and the merits. Consider "the somewhat analogous certificate of appealability . . . context," *In re Saint Fleur*, 824 F.3d 1337, 1343 (11th Cir. 2016) (Martin, J., concurring), in which "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has "emphasized" that this inquiry "is not coextensive with a merits analysis." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). But as the Court explained in the same discussion, "[o]f course when a court of appeals . . . determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious." *Id.* at 774. Indeed, the Supreme Court itself has affirmed the denial of a certificate of appealability based on its determination that a

33

habeas petitioner's claim failed as a matter of constitutional law. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (posing the dispositive question "whether the Constitution requires anything more" than the jury instructions the petitioner challenged and "hold[ing] that it does not"). In the second-or-successive context as in the appealability framework, that a threshold procedural inquiry and the merits are not *coextensive* does not mean that they do not *overlap*.

Even in the *Batson* and Title VII examples—which, as I have explained, do not clarify what section 2244(b)(3)(C) means when it refers to "a prima facie showing"—a plaintiff's prima facie case is not independent of "the merits." If a court rejects a *Batson* claim because the claimant has failed to establish the requisite prima facie showing, nobody would dispute that the court has rejected that claim on the merits. *See Brown v. Alexander*, 543 F.3d 94, 103 (2d Cir. 2008) (applying the framework for claims "adjudicated on the merits in [s]tate court," 28 U.S.C. § 2254(d), to a "decision that a *prima facie* case had not been made out under *Batson*"); *Franklin v. Sims*, 538 F.3d 661, 666 (7th Cir. 2008) (same). And if a court grants summary judgment against a Title VII claim because the plaintiff has failed to discharge his prima facie burden under *McDonnell Douglas*, nobody would dispute that that claim too has been decided on the merits. *See Morón-Barradas v. Dep't of Educ. of P.R.*, 488 F.3d 472, 478–80 (1st Cir. 2007) (granting preclusive effect to a Puerto Rico court's determination that a Title VII plaintiff

34

had failed to establish a prima facie case of discrimination). In each of these cases, any distinction between "the merits question" and "the prima facie showing alone" collapses when the plaintiff fails at step one. Dissenting Op. of Martin, J., at 70; *see also Jackson v. United States*, 875 F.3d 1089, 1091 n.4 (11th Cir. 2017) (explaining that the dismissal of a complaint with prejudice for failure to state a claim is ordinarily "an adjudication on the merits").

So what remains of Judge Martin's critique after we discard the mistaken premise that merits are merits, threshold inquiries are threshold inquiries, and never the twain shall meet? Her dissent objects to eight published orders because they decided that particular offenses were crimes of violence or violent felonies, *see* Dissenting Op. of Martin, J., at 75–77, but it never explains how it is inconsistent with our gatekeeping function under section 2255(h) to deny applications based on questions of law—which we usually think it is our job to answer—and a routine examination of judicial records—which we must often wade into in any event to determine whether a motion would indeed be "second or successive." *See Evans-García v. United States*, 744 F.3d 235, 240 (1st Cir. 2014) ("[A] circuit court should deny certification where it is clear as a matter of law, and without the need to consider contested evidence, that the petitioner's identified constitutional rule does not apply to the petitioner's situation."); *cf. S-V-*, 22 I. & N. Dec. at 1309 (finding no "prima facie eligibility for withholding of removal"

35

based on the Board's discretionary first-instance determination that the movant's robbery conviction was for a "particularly serious crime"). The dissent protests that "the heavily abridged second or successive application procedures" impair our ability to make a reasoned decision, Dissenting Op. of Martin, J., at 76, but it never explains why 30 days is too little time for three judges with the help of their law clerks and staff attorneys to research and decide the discrete legal issue whether a particular offense is or is not a crime of violence, an inquiry with which our Court has plenty of experience. *See id.* at 61 (observing that "[t]he issue of what constitutes a crime of violence . . . has been the subject of extensive consideration in this Circuit").

This Court is not the only circuit that has published orders denying prisoners' applications on the ground that *Johnson* could not benefit them because their predicate offenses were crimes of violence. *See In re Irby*, 858 F.3d 231 (4th Cir. 2017); *Dawkins v. United States*, 809 F.3d 953 (7th Cir. 2016). And, as long as we are on the subject of persuasive authority, several of our sister circuits have disagreed with Judge Martin's "permissive[]" notion of how the application process should work in other ways. Dissenting Op. of Martin, J., at 73. For example, five circuits—four not counting ours—have held that the Act permits courts of appeals to deny second or successive collateral challenges based on manifest untimeliness, at least in certain circumstances. *See In re Williams*, 759

F.3d 66, 68–69 (D.C. Cir. 2014); *In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014); *In re Lewis*, 484 F.3d 793, 798 (5th Cir. 2007); *In re Hill*, 437 F.3d 1080, 1083 (11th Cir. 2006); *Outlaw v. Sternes*, 233 F.3d 453, 455 (7th Cir. 2000); *see also In re Jackson*, 826 F.3d 1343, 1350 & n.8 (11th Cir. 2016) (acknowledging that a "hands-off approach" with respect to timeliness "will not suit every application" and reaffirming *Hill*). The First Circuit has held that it can rely on judicial records to determine that an applicant is outside the scope of a new rule. *See Evans-García*, 744 F.3d at 240. And the Fifth and Eighth Circuits have held that a second or successive collateral challenge does not "contain" or "rel[y] on" a new rule when it "depends on recognition of a second new rule" that would be an extension of the first. *Donnell v. United States*, 826 F.3d 1014, 1016 (8th Cir. 2016); *accord In re Arnick*, 826 F.3d 787, 788 (5th Cir. 2016). Now is not the time to examine whether all of these decisions were correct; lest we forget, the Court today is denying rehearing en banc of a *direct* appeal. But it is significant that the dissent's minimalist concept of our gatekeeping function would unsettle not just our own practices but also those of many of our sister circuits.

The dissent complains that "[t]he members of this Court are bound to treat [our published orders] as binding precedent in this Circuit, unless and until the Supreme Court or this Court sitting *en banc* reverses each of them, one by one," but the same is true of *all* of our precedents. Dissenting Op. of Martin, J., at 83. Of

course, Judge Martin and our other dissenting colleagues are free to disagree with the legal conclusions that panels have reached in the course of denying applications to file second or successive motions. But if they do, they would be better served by trying to persuade the rest of us to reconsider those holdings en banc, *see* Concurring Op. of Tjoflat, J., at 17–22, than by rehashing their position that we cannot deny the doomed applications of prisoners who cannot achieve relief, *compare, e.g.*, Dissenting Op. of Wilson, J., at 53–57, *and* Dissenting Op. of Martin, J., at 64–84, *with Ovalles v. United States*, 905 F.3d 1231, 1266–73 (11th Cir. 2018) (en banc) (Martin, J., dissenting); *In re Williams*, 898 F.3d 1095, 1100–05 (11th Cir. 2018) (Wilson, J., specially concurring); *id.* at 1105–10 (Martin, J., specially concurring); *In re Hernandez*, 857 F.3d 1162, 1165–66 (11th Cir. 2017) (Martin, J., concurring in result); *In re Clayton*, 829 F.3d 1254, 1263–67 (11th Cir. 2016) (Martin, J., concurring in result); *In re McCall*, 826 F.3d 1308, 1311–12 (11th Cir. 2016) (Martin, J., concurring); *In re Colon*, 826 F.3d 1301, 1308 (11th Cir. 2016) (Martin, J., dissenting); *and Saint Fleur*, 824 F.3d at 1341–44 (Martin, J., concurring).

Finally, some of the complaints in Judge Martin's dissent less reflect disagreement with our precedents than dissatisfaction with Congress's policy choices. The dissent laments that the Act gives prisoners only "one chance to collaterally attack their sentence as a matter of right" and that the chance "comes

too soon" for some convicts with lengthy sentences, Dissenting Op. of Martin, J., at 64, but the statutory system of alternating limitations periods constitutes an integral part of Congress's orderly regulation of federal postconviction review, *see* 28 U.S.C. §§ 2244(d), 2255(f). The dissent charges us with abusing our "gatekeeping function" "to lock the gate and throw away the key," Dissenting Op. of Martin, J., at 84, but we have done no more than to execute our gatekeeping function under the Act as we have understood it at least ever since we held in *Holladay* that not every application that incants a new rule opens the lock. The dissent protests that "prisoners sentenced in Alabama, Florida and Georgia may be serving illegal sentences for which they have no remedy," *id.*, but Congress has emphatically rejected an error-correction-at-all-costs model of postconviction review.

Instead, Congress has decided that collateral litigation, like all things, must eventually come to an end. And we are bound to respect that mandate.

39

JORDAN, Circuit Judge, concurring in the denial of rehearing en banc.

The panel in this case has held that published orders issued by three-judge panels on applications for leave to file second or successive habeas corpus petitions or motions to vacate, pursuant to 28 U.S.C. §§ 2244(b)(2)-(3), 2255(h), constitute binding precedent in our circuit. *See United States v. St. Hubert*, 909 F.3d 335, 345-46 (11th Cir. 2018). I voted against rehearing this case en banc because I cannot think of a workable common-law principle that denies precedential effect to such orders. If there is going to be some change in the effect given to these orders, I believe that will need to be done by way of a court rule (e.g., a rule providing [as we have done with unpublished opinions] that such orders do not have precedential effect, or a rule providing that such orders will only be binding in the second or successive application context, or a rule providing that such orders can be published only when there has been adversarial briefing).[1]

Nevertheless, I have institutional concerns about our recent practice of publishing so many of these orders. I include myself as part of the problematic trend, as I have authored one of these orders, *see In re Moss*, 703 F.3d 1301 (11th Cir. 2013), and have also been a member of panels which have issued others.

＊ ＊ ＊ ＊ ＊ ＊

---

[1] I am not aware of any rules in other circuits addressing this issue.

40

Applications under §§ 2244(b)(2)-(3) and 2255(h) are different in significant respects from the matters usually handled by three-judge panels. Those differences strongly suggest that we should exercise more caution in deciding to publish an order disposing of an application, particularly on substantive issues of first impression.

First, the applications must be decided within 30 days of filing. *See* § 2244(b)(3)(D). Although this time limit is not mandatory in the jurisdictional sense, *see, e.g., In re Davis*, 565 F.3d 810, 813 (11th Cir. 2009) (order issued in April of 2009 for an application filed in October of 2008 asserting actual innocence), we try very hard to meet the compressed timeline imposed by Congress. But, practically speaking, we do not have 30 full days to do our work. The panel usually receives the staff attorney memorandum on the application (which is often pro se) a week or two from the date of filing, leaving only two to three weeks to rule on the application (while, of course, tending to numerous other matters, including other applications). This abbreviated schedule, which does not generally exist with respect to the other motions we handle on a daily or weekly basis, can lead to rulings without sufficient time for analysis and reflection. And that, in turn, can result in mistakes.

Second, in this circuit the applications are almost always ruled upon without adversarial participation or briefing. Sometimes we decide only on the basis of a pro se litigant's submission, as supplemented by a staff attorney memorandum. In a system like ours, that means that we may miss something important (e.g., critical

41

parts of the district court record, or an issue we did not think of ourselves) on the quick road to decision and publication.

Third, the applications result in decisions that are not generally reviewable. Pursuant to § 2244(b)(3)(E), orders on applications are not appealable and cannot be the subject of a petition for rehearing or for a writ of certiorari. Panels have on occasion revisited their orders sua sponte (for example, when the staff attorney's office has called a panel's attention to a mistake), but relying on a panel to identify and recognize its own error without assistance from the parties once the application is adjudicated is certainly not the norm in appellate procedure. I recognize that it is an open question whether an order disposing of an application can be the subject of a sua sponte en banc proceeding. But even if that limited avenue exists, the absence of typical channels of review provides an additional institutional reason to publish fewer of these now-binding orders.

In sum, when we review and rule on applications pursuant to §§ 2244(b) and 2255(h), "major aspects of the normal appellate process [are] absent." *United States v. Glover*, 731 F.2d 41, 49 (D.C. Cir. 1984) (Mikva, J., dissenting about then-existing summary affirmance procedures). "There are no briefs, no oral arguments, [and] no collegiality of the decisional process. There is no time for deliberation, and very little dialogue on the merits, on the process, or the result." *Id.* at 50. We are stuck

42

with the 30-day limit that Congress has set for us, but that deadline should mean less published orders, not more.

\* \* \* \* \*

In the last five years (2013-18) we lead the country by a significant margin in the number of published orders issued under §§ 2244(b)(2)-(3) and 2255(h).  In that five-year period, ending April 1, 2018, we have published 45 such orders, while all of the other circuits combined have published 80 orders.  The next closest circuits to ours in publication are the Fifth Circuit with 14 and the Sixth Circuit with 12.  The remaining circuits have fewer than 10 each: First Circuit (7); Second Circuit (6); Third Circuit (3); Fourth Circuit (6); Seventh Circuit (8); Eighth Circuit (9); Ninth Circuit (7); Tenth Circuit (7); and D.C. Circuit (1). And a number of the published orders in the other circuits were issued only after adversarial briefing and/or oral argument.[2]

Two years ago, in the wake of *Johnson v. United States*, 135 S.Ct. 2551 (2015), and *Welch v. United States*, 136 S.Ct. 1257 (2016), we received around 2,000 applications under §§ 2244(b)(2)-(3) and 2255(h) (mostly filed by federal prisoners under § 2255(h)).  Given this avalanche of filings, and the 30-day clock, there were days when I (and probably every judge then on the court) would review 40-50

---

[2] The published orders from our court and from the other circuits during this five-year period are listed in the attached appendix.

43

applications and have time for little else. Yet, despite the overwhelming number of applications we received, and the very limited time we had to resolve them, in 2016 we managed to publish 35 of our orders. In that same year, our sister circuits published a total of just 20 orders: First Circuit (0); Second Circuit (0); Third Circuit (0); Fourth Circuit (3); Fifth Circuit (4); Sixth Circuit (3); Seventh Circuit (4); Eighth Circuit (3); Ninth Circuit (1); Tenth Circuit (2); and D.C. Circuit (0). If the other circuits can get by without adding to the pages in the Federal Reporter, we should be able to as well.

* * * * * *

Publishing orders issued under §§ 2244(b)(2)-(3) and 2255(h) sometimes makes sense. For example, in *In re Holladay*, 331 F.3d 1169, 1173-74 (11th Cir. 2003), we explained what a "prima facie case" means under § 2244(b). Given that the "prima facie case" requirement applies to all applications filed, it was important to have a general governing standard for all panels to apply.

But there are downsides to publishing too many of these orders, which now constitute binding precedent. I hope that in the coming years we will use the publication option sparingly.

## Appendix of Published Orders under 28 U.S.C. §§ 2244(b) & 2255(h) in the Circuit Courts of Appeals from April 1, 2013, to April 1, 2018

### First Circuit

44

*Pagan-San Miguel v. United States*, 736 F.3d 44 (1st Cir. 2013)

*Evans-Garcia v. United States*, 744 F.3d 235 (1st Cir. 2014)

*Butterworth v. United States*, 775 F.3d 459 (1st Cir. 2015)

*Pakala v. United States*, 804 F.3d 139 (1st Cir. 2015)

*Bucci v. United States*, 809 F.3d 23 (1st Cir. 2015)

*Moore v. United States*, 871 F.3d 72 (1st Cir. 2017)

*Hardy v. United States*, 871 F.3d 85 (1st Cir. 2017)

## Second Circuit

*Gallagher v. United States*, 711 F.3d 315 (2d Cir. 2013)

*United States v. Redd*, 735 F.3d 88 (2d Cir. 2013)

*Herrera-Gomez v. United States*, 755 F.3d 142 (2d Cir. 2014)

*Marmolejos v. United States*, 789 F.3d 66 (2d Cir. 2015)

*Carranza v. United States*, 794 F.3d 237 (2d Cir. 2015)

*Washington v. United States*, 868 F.3d 64 (2d Cir. 2017)

## Third Circuit

*In re Pendleton*, 732 F.3d 280 (3d Cir. 2013) (adversarial briefing/oral argument)

*United States v. Winkelman*, 746 F.3d 134 (3d Cir. 2014)

*In re Hoffner*, 870 F.3d 301 (3d Cir. 2017)

## Fourth Circuit

*In re Vassell*, 751 F.3d 267 (4th Cir. 2014) (adversarial briefing/oral argument)

*In re Hubbard*, 825 F.3d 225 (4th Cir. 2016) (adversarial briefing/oral argument)

*In re McFadden*, 826 F.3d 706 (4th Cir. 2016) (adversarial briefing/oral argument)

*In re Wright*, 826 F.3d 774 (4th Cir. 2016) (adversarial briefing/oral argument)

*In re Irby*, 858 F.3d 231 (4th Cir. 2017) (adversarial briefing/oral argument)

*In re Phillips*, 879 F.3d 542 (4th Cir. 2018) (adversarial briefing/oral argument)

## Fifth Circuit

*In re Kemper*, 735 F.3d 211 (5th Cir. 2013)

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014)

*In re Coleman*, 768 F.3d 367 (5th Cir. 2014)

*In re Jackson*, 776 F.3d 292 (5th Cir. 2015)

*In re Young*, 789 F.3d 518 (5th Cir. 2015)

*In re Chase*, 804 F.3d 738 (5th Cir. 2015)

*In re Williams*, 806 F.3d 322 (5th Cir. 2015)

*In re Fields*, 826 F.3d 785 (5th Cir. 2016) (adversarial briefing)

*In re Arnick*, 826 F.3d 787 (5th Cir. 2016)

*In re Hensley*, 836 F.3d 504 (5th Cir. 2016)

*In re Lott*, 838 F.3d 522 (5th Cir. 2016)

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) (adversarial briefing)

*In re Dockery*, 869 F.3d 356 (5th Cir. 2017)

*In re Rodriguez*, 885 F.3d 915 (5th Cir. 2018)


**Sixth Circuit**

*In re Liddell*, 722 F.3d 737 (6th Cir. 2013)

*In re Mazzio*, 756 F.3d 487 (6th Cir. 2014) (adversarial briefing)

*In re Watkins*, 810 F.3d 375 (6th Cir. 2015)

*In re Embry*, 831 F.3d 377 (6th Cir. 2016) (adversarial briefing)

*In re Patrick*, 833 F.3d 584 (6th Cir. 2016) (adversarial briefing)

*In re Sargent*, 837 F.3d 675 (6th Cir. 2016) (adversarial briefing)

*In re Tibbetts*, 869 F.3d 403 (6th Cir. 2017) (adversarial briefing)

*In re Coley*, 871 F.3d 455 (6th Cir. 2017) (adversarial briefing)

*In re Conzelmann*, 872 F.3d 375 (6th Cir. 2017)

*In re Campbell*, 874 F.3d 454 (6th Cir. 2017) (adversarial briefing)

*In re Lee*, 880 F.3d 242 (6th Cir. 2018)

*In re Black*, 881 F.3d 430 (6th Cir. 2018) (adversarial briefing)


**Seventh Circuit**

*Croft v. Williams*, 773 F.3d 170 (7th Cir. 2014)

*Price v. United States*, 795 F.3d 731 (7th Cir. 2015) (adversarial briefing)

*Dawkins v. United States*, 809 F.3d 953 (7th Cir. 2016) (adversarial briefing)

*Hill v. United States*, 827 F.3d 560 (7th Cir. 2016) (adversarial briefing)

*Morris v. United States*, 827 F.3d 696 (7th Cir. 2016) (adversarial briefing)

*Dawkins v. United States*, 829 F.3d 549 (7th Cir. 2016) (adversarial briefing)

*Kelly v. Brown*, 851 F.3d 686 (7th Cir. 2017) (adversarial briefing)

*Susinka v. United States*, 855 F.3d 728 (7th Cir. 2017)


**Eighth Circuit**

*Williams v. United States*, 705 F.3d 293 (8th Cir. 2013)

*Johnson v. United States*, 720 F.3d 720 (8th Cir. 2013)

*Woods v. United States*, 805 F.3d 1152 (8th Cir. 2015)

*Goodwin v. Steele*, 814 F.3d 901 (8th Cir. 2014)

*Donnell v. United States*, 826 F.3d 1014 (8th Cir. 2016)

*Holder v. United States*, 836 F.3d 891 (8th Cir. 2016)

*Allen v. United States*, 836 F.3d 894 (8th Cir. 2016)

*Davis v. Kelley*, 854 F.3d 967 (8th Cir. 2017)

*Williams v. Kelley*, 858 F.3d 464 (8th Cir. 2017)


**Ninth Circuit**

*Jones v. Ryan*, 733 F.3d 825 (9th Cir. 2013)

*Hughes v. United States*, 770 F.3d 814 (9th Cir. 2014) (adversarial briefing/oral argument)

*Ezell v. United States*, 778 F.3d 762 (9th Cir. 2015) (adversarial briefing)

*Gage v. Chappell*, 793 F.3d 1159 (9th Cir. 2015) (adversarial briefing/oral argument)

*Orona v. United States*, 826 F.3d 1196 (9th Cir. 2016) (adversarial briefing)

*Sherrod v. United States*, 858 F.3d 1240 (9th Cir. 2017) (adversarial briefing)

*Arazola-Galea v. United States*, 876 F.3d 1257 (9th Cir. 2017) (adversarial briefing)


**Tenth Circuit**

*In re Graham*, 714 F.3d 1181 (10th Cir. 2013)

*In re Weathersby*, 717 F.3d 1108 (10th Cir. 2013)

*In re Payne*, 733 F.3d 1027 (10th Cir. 2013)

*In re Gieswein*, 802 F.3d 1143 (10th Cir. 2015)

*In re Encinias*, 821 F.3d 1224 (10th Cir. 2016)

*In re Barrett*, 840 F.3d 1223 (10th Cir. 2016)

*In re Jones*, 847 F.3d 1293 (10th Cir. 2017)

**Eleventh Circuit**

*In re Moss*, 703 F.3d 1301 (11th Cir. 2013)

*In re Morgan*, 713 F.3d 1365 (11th Cir. 2013)

*In re Hill*, 715 F.3d 284 (11th Cir. 2013)

*In re Henry*, 757 F.3d 1151 (11th Cir. 2014)

*In re Lambrix*, 776 F.3d 789 (11th Cir. 2015)

*In re Hill*, 777 F.3d 1214 (11th Cir. 2015)

*In re Rivero*, 797 F.3d 986 (11th Cir. 2015)

*In re Everett*, 797 F.3d 1282 (11th Cir. 2015)

*In re Starks*, 809 F.3d 1211 (11th Cir. Jan. 8, 2016)

*In re Bolin*, 811 F.3d 403 (11th Cir. Jan. 4, 2016)

*In re Johnson*, 814 F.3d 1259 (11th Cir. Feb. 26, 2016)

*In re Franks*, 815 F.3d 1281 (11th Cir. Jan. 6, 2016)

*In re Robinson*, 822 F.3d 1196 (11th Cir. Apr. 19, 2016)

*In re Thomas*, 823 F.3d 1345 (11th Cir. May 25, 2016)

*In re Griffin*, 823 F.3d 1350 (11th Cir. May 25, 2016)

*In re Pinder*, 824 F.3d 977 (11th Cir. Jun. 1, 2016)

*In re Hines*, 824 F.3d 1334 (11th Cir. Jun. 8, 2016)

*In re St. Fleur*, 824 F.3d 1337 (11th Cir. Jun. 8, 2016)

*In re Adams*, 825 F.3d 1283 (11th Cir. Jun. 15, 2016)

*In re Hires*, 825 F.3d 1297 (11th Cir. Jun. 15, 2016)

*In re Rogers*, 825 F.3d 1335 (11th Cir. Jun. 17, 2016)

*In re Colon*, 826 F.3d 1301 (11th Cir. Jun. 24, 2016)

*In re McCall*, 826 F.3d 1308 (11th Cir. Jun. 17, 2016)

*In re Jackson*, 826 F.3d 1343 (11th Cir. Jun. 24, 2016)

*In re Williams*, 826 F.3d 1351 (11th Cir. Jun. 24, 2016)

*In re Parker*, 827 F.3d 1286 (11th Cir. Jul. 7, 2016)

*In re Gordon*, 827 F.3d 1289 (11th Cir. Jul. 8, 2016)

*In re Sapp*, 827 F.3d 1334 (11th Cir. Jul. 7, 2016)

*In re Baptiste*, 828 F.3d 1337 (11th Cir. Jul. 13, 2016)

*In re Clayton*, 829 F.3d 1254 (11th Cir. Jul. 18, 2016)

*In re Smith*, 829 F.3d 1276 (11th Cir. Jul. 18, 2016)

*In re Burgest*, 829 F.3d 1285 (11th Cir. Jul. 21, 2016)

*In re Watt*, 829 F.3d 1287 (11th Cir. Jul. 21, 2016)

*In re Anderson*, 829 F.3d 1290 (11th Cir. Jul. 22, 2016)

*In re Davis*, 829 F.3d 1297 (11th Cir. Jul. 21, 2016)

*In re Gomez*, 830 F.3d 1225 (11th Cir. Jul. 25, 2016)

*In re Sams*, 830 F.3d 1234 (11th Cir. Jul. 26, 2016)

*In re Moore*, 830 F.3d 1268 (11th Cir. Jul. 27, 2016)

*In re Bradford*, 830 F.3d 1273 (11th Cir. Jul. 27, 2016)

*In re Jones*, 830 F.3d 1295 (11th Cir. Jul. 27, 2016)

*In re Chance*, 831 F.3d 1335 (11th Cir. Aug. 2, 2016)

*In re Parker*, 832 F.3d 1250 (11th Cir. Aug. 10, 2016)

*In re Hunt*, 835 F.3d 1277 (11th Cir. Jul. 18, 2016)

*In re Hernandez*, 857 F.3d 1162 (11th Cir. 2017)

*In re Welch*, 884 F.3d 1319 (11th Cir. 2018)

## D.C. Circuit

*In re Williams*, 759 F.3d 66 (D.C. Cir. 2014) (adversarial briefing/oral argument)

49

WILSON, Circuit Judge, joined by MARTIN and JILL PRYOR, Circuit Judges, joined as to Part II by ROSENBAUM, Circuit Judge, dissenting from the denial of rehearing en banc:

## I.

Before the Supreme Court decided *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), a panel of this Court attempted to sustain the constitutionality of 18 U.S.C. § 924(c) and Mr. St. Hubert's convictions under it. *See generally United States v. St. Hubert* (*St. Hubert I*), 883 F.3d 1319 (11th Cir. 2018), *vacated and replaced*, 909 F.3d 335 (11th Cir. 2018). In pursuit of that goal, the panel: (A) relied on two published panel orders, which had been decided based on forty-three and ninety-eight words of argument, respectively, *see id.* at 1328–29; (B) held that attempting to commit a crime of violence is itself a crime of violence, *see id.* at 1333–34; (C) suggested that we use the modified categorical approach instead of the categorical approach, *see id.* at 1334–36; and (D) attempted to predict what the Supreme Court would hold in *Dimaya*, concluding that "no matter the outcome" of *Dimaya*, § 924(c) would stand. *See id.* at 1336–37.

The panel has now backed away from some of those holdings. And for good reason—it is difficult to predict what the Supreme Court will do. The Supreme Court in *Dimaya* "demolished" the superficial differences between § 924(c),

50

*Johnson*'s ACCA, and *Dimaya*'s § 16(b) on which the *St. Hubert I* opinion relied.[1]

Likewise, the panel now embraces the conduct-based approach that this Court adopted in *Ovalles II*, *see* 905 F.3d at 1251–52, without mention of its previous unwavering defense of the categorical approach and the modified categorical approach. *Compare United States v. St. Hubert* (*St. Hubert II*), 909 F.3d 335, 344–46 (11th Cir. 2018), *with St. Hubert I*, 883 F.3d at 1330–31, 1334–37; *see also Ovalles I*, 861 F.3d at 1268–69 (applying the categorical approach without question).

Neither *Ovalles II* nor *St. Hubert II* explain what has changed since *Ovalles I* or *St. Hubert I*, or since we first applied the categorical approach to § 924(c) in *United States v. McGuire*, 706 F.3d 1333 (11th Cir. 2013). This is, I suspect, because nothing has changed, except that Justice Thomas wrote a strong dissent in *Dimaya*. *See* 138 S. Ct. at 1242–59 (Thomas, J., dissenting). This dissent took

_____

[1] *See Ovalles v. United States* (*Ovalles II*), 905 F.3d 1231, 1233–34 (11th Cir. 2018) (en banc); *see also* En Banc Oral Argument Recording for *Ovalles II*, 11th Cir. No. 17-10172, at 58:32, http://www.ca11.uscourts.gov/system/files_force/oral_argument _recordings/17-10172.mp3?download=1 ("With all due respect to the panel . . . I think that *Dimaya* fairly well demolishes the textual differences that the panel here identified."). The original *St. Hubert* opinion incorporated the superficial distinctions proffered by the original *Ovalles* panel opinion in distinguishing § 924(c) from the ACCA. *See St. Hubert I*, 883 F.3d at 1328. *St. Hubert I* offered similar differences between § 924(c) and *Dimaya*'s § 16(b). *Compare id.* at 1336–37, *with Ovalles v. United States* (*Ovalles I*), 861 F.3d 1257, 1265–67 (11th Cir. 2017), *vacated*, 889 F.3d 1259 (11th Cir. 2018) (en banc). None of these distinctions survive *Dimaya*. *See generally Ovalles II*, 905 F.3d at 1239 ("In short, in the course of rebuffing the government's attempts to distinguish § 16's residual clause from the ACCA's, the *Dimaya* Court explicitly rejected the very same arguments that the panel in this case had adopted as a means of distinguishing § 924(c)(3)'s residual clause—calling them minor linguistic disparities that didn't make any real difference." (alteration adopted and internal quotation marks omitted)).

issue with statutory language that has not changed in at least twelve years, well before *McGuire* issued. I find it odd, therefore, that this Court now holds that Justice Thomas's dissent drawing attention to the unchanged language could (or "must") suddenly and unexpectedly trigger the doctrine of constitutional doubt. *Cf. Ovalles II*, 905 F.3d at 1238–39. Indeed, no other circuit has so contorted itself to salvage § 924(c), despite our en banc finding that such an interpretation is legally *required. Id.* at 1244 (concluding that § 924(c)'s residual clause "must" be "read to incorporate a conduct-based interpretation" under the constitutional doubt cannon). *Contra United States v. Eshetu*, 898 F.3d 36, 37 (D.C. Cir. 2018) ("*Dimaya* nowise calls into question [the] requirement of a categorical approach [for § 924(c)]."); *United States v. Salas*, 889 F.3d 681, 685–86 (10th Cir. 2018) (applying categorical approach to § 924(c) and invalidating that provision, after *Dimaya*).

But Judge Jill Pryor eloquently and thoroughly explained the flaws in the *Ovalles II* opinion, and it is therefore unnecessary to reiterate those points here. *See Ovalles II*, 905 F.3d at 1277–79 (Jill Pryor, J., dissenting). Judge Jill Pryor has also cataloged the problems with the panel's adherence to its rule that attempting a crime of violence is necessarily itself a crime of violence, and I join her dissent in full. *See infra* at 85–90 (Jill Pryor, J., dissenting from the denial of rehearing en banc); *see also Ovalles II*, 905 F.3d at 1297–99 (Jill Pryor, J., dissenting).

52

## II.

What particularly troubles me, however, is the panel's reaffirmation of its rule that published panel orders from the second or successive context bind all panels of this Court, even those deciding fully briefed and argued merits appeals. *See St. Hubert II*, 909 F.3d at 345–46. I have previously explained the grave problems inherent in this rule, *In re Williams*, 898 F.3d 1098, 1100–05 (11th Cir. 2018) (Wilson, J., specially concurring), and Judge Martin has worked for years to expose our Court's indefensible overreach in deciding second or successive applications, *see, e.g.*, *id.* at 1105 (Martin, J., specially concurring). In light of their importance, I will briefly reiterate the major procedural flaws in allowing such hurried, uncontested, and unappealable orders to bind this Court.

When a prisoner asks this Court for permission to file a second or successive habeas petition pursuant to 28 U.S.C. §§ 2244 and 2255, we must grant or deny the request on an emergency thirty-day basis. 28 U.S.C. § 2244(b)(3)(D). We make our decision based on the prisoner's application, which is written with a pen or typewriter on an extremely constraining form. *See* 11th Cir. R. 22-3(a). Few prisoners manage to squeeze more than 100 words into the permitted space. Some have attorneys, but they are subject to the same restrictive form as are pro se litigants. Nothing else is filed on our docket. The government never files a responsive pleading, and we never grant oral argument. Most troublingly, the

53

orders that come out of this lackluster process are unappealable.[2]  28 U.S.C.
§ 2244(b)(3)(E) ("The grant or denial of an authorization by a court of appeals to
file a second or successive application shall not be appealable and shall not be the
subject of a petition for rehearing or for a writ of certiorari.").

This stands in stark contrast to the practices of the other circuits, which often
hear oral argument and read particularized government briefs, and which consider
the statutory thirty-day time limit to be optional.  And, likely recognizing the
unenviable process that generates these second or successive orders, all other
circuits publish substantially fewer orders than we do.[3]  This process also differs
greatly from that of our merits appeals, in which we have no time constraints, we
have government briefing (and, when issuing a published opinion, we have
typically heard oral argument), and we have a full record.  Of course, parties may
appeal merits decisions to the Supreme Court and may ask for panel or en banc
rehearing in this Court.

Incredibly, despite this alarming contrast in process, by declining to take this
case en banc, the full Court has ratified the rule that these hastily-written,

---

[2] For a more in-depth discussion of these constraints.  *See In re Williams*, 898 F.3d at 1101–05.  For instance, sometimes the government files a "standing brief" or writes an individualized brief *after* the panel order issues.  *Id.* at 1102–03 n.9.  And death cases have their own procedures in this Circuit.  *See generally* 11th Cir. R. 22-4.  Further, we have, on occasion, disregarded the thirty-day limit, in violation of our now-binding precedent.  *In re Williams*, 898 F.3d at 1103 n.7.

[3] *See generally In re Williams*, 898 F.3d at 1102–10.

uncontested orders bind *all* panels, including merits panels.  These super-

precedents are *not* appealable to the Supreme Court, and may *not* be the subject of

a petition for rehearing.  Thus, a panel deciding a substantive issue in a published

order insulates itself from essentially *any* review.[4]  Despite the inability to seek

rehearing en banc or appeal to the Supreme Court, these published panel orders are

now afforded the same precedential weight as merits decisions.

Such a decision should have weighed greatly on this Court, and it should

have been sufficient for en banc consideration.  It is inconceivable that this Court

would want all motions panels, merits panels, and lower courts in the Circuit to be

---

[4] Sua sponte rehearing appears to be the only practically conceivable remedy for a mistake in a published panel order, and it is the remedy often proffered in asserting that these orders "are not beyond all review."  *See, e.g.*, *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015).  This is not much of a failsafe, considering that we have reheard only one out of our more than 10,000 panel orders en banc, *see In re Williams*, 898 F.3d at 1098, despite our unique decisional approach that is "fraught with hazard and subject to error."  *In re Leonard*, 655 F. App'x 765, 778–79 (11th Cir. 2016) (Martin, J., concurring).

There is also a theoretical possibility of our certifying a question involving a published order to the Supreme Court, *see In re Williams*, 898 F.3d at 1110 (Martin, J., concurring); *see also* 28 U.S.C. § 1254(2); Sup. Ct. R. 19, and a now-retired Justice once implied that he would have been open to such a question.  *See Felker v. Turpin*, 518 U.S. 651, 667 (1996) (Souter, J., concurring).  Although I would welcome any avenue of Supreme Court review of these orders, that Court has only accepted four certified questions since 1946, and has accepted none since 1981.  *See United States v. Seale*, 558 U.S. 985, 985 (2009) (Stevens, J., respecting the dismissal of the certified question); Aaron Nielson, *The Death of the Supreme Court's Certified Question Jurisdiction*, 59 CATH. U. L. REV. 483, 484–85 (2010).

So, if a panel declines to correct a mistake in a published panel order, that panel can be overruled only by: (A) sua sponte en banc rehearing by this court—which has happened for one out of more than 10,000 orders; or (B) the Supreme Court's acceptance of a certified question—which has happened four times in the last seventy-two years.  This purported backstop is illusory, and it should not be used as a justification for allowing these orders to bind merits panels.

55

bound on substantive issues by an order decided on the basis of forty-three words of pro se argument, in under thirty-days, with no avenue of appeal or review. It is similarly inconceivable that this Court would establish this rule without rehearing en banc. Because I cannot support such a rule, I dissent from the denial of rehearing en banc.

Judge Tjoflat takes offense to my dissent, which sheds light on what I believe is an unfair process.[5] Thoughtful and respectful disagreement is essential to our constitutional directive—"[t]he premise of our adversarial system is that appellate courts . . . [are] arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.). There is sometimes impassioned but collegial disagreement about the answers to those questions. But to turn substantive disagreement into a sweeping charge that contrary views are "attacks on the integrity of the court as an institution" is another thing entirely. It is the great respect for both this Court as an institution and the judicial role that leads members of this Court to dissent. And if anyone has the duty to raise concerns about the fairness of this Court's process for

---

[5] Judge Tjoflat says the dissenters here lack credibility to criticize our Court for publishing *Johnson* orders when we have done so ourselves. *See* Tjoflat Op. at 12–13. He would apparently instead have us effectively forfeit our votes on *Johnson* entirely—ensuring that the majority's view of *Johnson* is the only view with the force of binding precedent. But once the Court decided to use published *Johnson* orders as the vehicle for developing our habeas law, we had little choice. Declining to participate would have abdicated our responsibility to develop Eleventh Circuit law by effectively assigning our votes to our colleagues who continued to insist on publishing such orders.

56

resolving a category of appeals, it is a member of this Court.  Consistent with that

duty, I will continue to express disagreement when important issues are at stake.

In another case, when Judge Tjoflat is in the minority, he will be entitled to do the

same.

MARTIN, Circuit Judge, with whom JILL PRYOR, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

Federal judges who decide cases in groups are bound to have differences of opinions about how those cases are decided.  I've always understood that it is the discussion of those differing views that furthers the development and evolution of the laws and precedent that govern us all.  My understanding does not appear to be unique, because if there is any member of this court who has not written a dissenting opinion, they have not been on this court for very long.  As for this dissent, it is certainly not an attack on the institution of the federal courts, to which I have devoted the last eighteen years of my professional life.  Rather, this dissent is intended to honor the role I have been given on this court.  I understand my oath to require me to point out procedures or interpretations of the law that I view as hampering our ability to administer justice to the people who come before us.  If I have distorted any fact in this opinion, I request that someone tell me what that fact is so that I can correct my mistake.

As my colleagues have pointed out, this case is the direct appeal of Michael St. Hubert, who was sentenced to serve a 32-year prison sentence in 2016.  Although this is Mr. St. Hubert's first opportunity to challenge his conviction and sentence in this court, his opportunity is limited by rulings this court has made in our habeas jurisprudence.  So while Mr. St. Hubert is sitting in prison, his case has generated what I view as a healthy discussion of how it came to pass that he will be

58

required to serve the entirety of a sentence that could not be legally imposed upon him if he were sentenced today. Six of the twelve of the active judges on this court have written opinions about Mr. Hubert's case, so it seems to have merited a valuable exchange of viewpoints.

Michael St. Hubert was 37-years-old when he pled guilty to two firearms charges brought against him under 18 U.S.C. § 924(c). At that 2016 hearing, the District Judge explained that Mr. St. Hubert would not be a free man until after his 69th birthday. Then, in a sprawling opinion reviewing Mr. St. Hubert's direct appeal, a panel of this Court affirmed Mr. St. Hubert's convictions and 32-year sentence, holding that the offenses underlying his convictions—Hobbs Act robbery and attempted Hobbs Act robbery—qualify as crimes of violence under § 924(c)'s residual and use-of-force clauses. See United States v. St. Hubert ("St. Hubert II")[6], 909 F.3d 335 (11th Cir. 2018).

There are several problems with the panel opinion that I believe deserve the attention of the en banc Court. Judge Wilson and Judge Jill Pryor each cogently address some of those problems, and I am privileged to join their dissents in full.

---

[6] As the term St. Hubert II would indicate, we are not discussing the original opinion issued by the panel ruling on Mr. St. Hubert's direct appeal of his conviction and sentence. The panel originally issued an opinion ruling against Mr. St. Hubert on February 28, 2018. See United States v. St. Hubert, 883 F.3d 1319 (11th Cir. 2018). On November 15, 2018, the panel vacated its February 2018 opinion and issued its second and broader opinion ruling against Mr. St. Hubert. St. Hubert II, 909 F.3d at 335, 337. It is this second opinion which is now the subject of these dissents to denial of en banc review.

See Wilson, J., dissenting op. at 50–57 (discussing the St. Hubert II panel's troubling reaffirmation of its ruling that published panel orders from the second or successive context bind all panels of this Court); Jill Pryor, J., dissenting op. at 85–90 (arguing the panel erroneously held attempting a crime of violence itself equates to a crime of violence).

In writing separately, I echo some of my colleagues' concerns. But beyond that, Mr. St. Hubert's case offers a valuable illustration of why I've been concerned about how this Circuit has parlayed the limited authority given it under 28 U.S.C. § 2244(b) (statute governing second or successive habeas petitions) to stop thorough consideration of the issues presented by people like Mr. St. Hubert, even on his direct appeal. It is an aberration that a statute meant to govern the treatment of inmates who seek to file a second or successive § 2255 motion now serves as a tool for this Court to limit the review of prison sentences on direct appeal. I am convinced this aberration results from our Court failing to follow the plain mandate of 28 U.S.C. § 2244(b)(3)(C). Since this is his case, I will begin with Mr. St. Hubert.

## I.

Michael St. Hubert pled guilty to two counts of using, carrying, and brandishing a firearm in violation of 18 U.S.C. § 924(c). A conviction under § 924(c) is warranted only if a defendant uses a firearm during a "crime of violence

or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). Mr. St. Hubert appealed his convictions and 32-year sentence to this Court, arguing that his underlying offenses—Hobbs Act robbery and attempted Hobbs Act robbery—do not qualify as crimes of violence required to support a conviction under § 924(c).

His is no pro forma challenge. His appeal raises the now-hot topic, unresolved by the Supreme Court, of whether Hobbs Act robbery and attempted Hobbs Act robbery qualify as violent felonies so as to justify his convictions for using a firearm in connection with "any crime of violence." 18 U.S.C. § 924(c)(1)(A). The issue of what constitutes a crime of violence under § 924(c) has been the subject of extensive consideration in this Circuit as well as our sister circuits. See, e.g., Ovalles v. United States, 905 F.3d 1231, 1234 (11th Cir. 2018) (en banc) (prescribing a conduct-based approach for determining whether an offense qualifies as a crime-of-violence under § 924(c)(3)'s residual clause); id. at 1277–99 (Jill Pryor, J., dissenting, joined by three judges of this Court) (arguing the categorical approach must govern § 924(c)'s definition of "crime of violence" and contending § 924(c)'s residual clause is void for vagueness under this approach); see also, e.g., United States v. Eshetu, 898 F.3d 36, 37 (D.C. Cir. 2018) (per curiam) (vacating § 924(c) convictions in light of Sessions v. Dimaya, 584 U.S. __, 138 S. Ct. 1204 (2018), and leaving for the full D.C. Circuit the question of whether a conduct-based construction might save § 924(c)'s residual clause);

61

United States v. Salas, 889 F.3d 681, 684–86 (10th Cir. 2018) (vacating § 924(c) conviction in light of Dimaya).

For Mr. St. Hubert and others who were convicted of § 924(c) violations within the Eleventh Circuit, the answers to these questions may be especially consequential. Penalties for § 924(c) are notoriously harsh—requiring a 5-to-10-year sentence for a first conviction and a mandatory minimum and consecutive 25-year sentence for a second, and a third, etc. 18 U.S.C. § 924(c)(1)(A), (1)(C), (1)(D)(ii). Under the statute at the time of his conviction, each of Mr. St. Hubert's two § 924(c) convictions had to carry separate, consecutive sentences. Id. § 924(c)(1)(A), (1)(D)(ii). In south Florida, where Mr. St. Hubert was charged and convicted, prosecutors have routinely charged more than one § 924(c) count, which is sometimes referred to as "stacking" those charges. This charging decision leaves the sentencing court no choice but to add decades to sentences of defendants who took part in a crime spree that involved firearms in more than one location. Specifically, for Mr. St. Hubert, the decision to charge him with the second § 924(c) violation added 25 years to his sentence. Notably, the recently enacted First Step Act of 2018 would not have permitted this type of "stacking" of § 924(c) charges in Mr. St. Hubert's case. See S. Res. 756, 115th Cong. § 403 (2018) (enacted). To say it plainly, this new law would today prohibit 25 years of the 32-year sentence imposed on Mr. St. Hubert in 2016.

Also notable, available data indicates that federal prosecutors in different parts of the country have different practices related to charging a defendant with a § 924(c) violation for one, or two, or every incident in which a gun was used or carried during a crime spree. See U.S. Sentencing Comm'n, Report to Congress: Mandatory Minimum Penalties for Firearms Offenses in the Federal Criminal Justice System 22 (2018) (explaining, in fiscal year 2016, Southern Florida was one of only 8 districts out of 78 reporting any cases in which more than one count of § 924(c) was charged). Thus, the random factors of time and geography mean that Mr. St. Hubert will serve a significantly longer sentence than a person who committed precisely the same crime but did so more recently or in another part of the country.

The panel rejected Mr. St. Hubert's arguments about the nature of his prior convictions. It deemed both his Hobbs Act robbery and attempted Hobbs Act robbery to be crimes of violence under both § 924(c)'s residual clause and its use-of-force clause. See St. Hubert II, 909 F.3d at 344–53. By my count, the St. Hubert II panel opinion ruled against Mr. St. Hubert in four different ways. Two of those rulings alone would have ended his appeal by affirming his convictions and 32-year sentence. I say the alternative holdings reach beyond what was necessary to decide Mr. St. Hubert's case. Even so, those gratuitous rulings bind future panels of this Court in cases for which they should have been allowed a

fresh look.  Here, I will address one especially harmful holding: that the St. Hubert II panel was bound to characterize Mr. St. Hubert's crimes as "violent" because panels of this Court had done so in earlier rulings denying applications for leave to file second or successive § 2255 motions.  See St. Hubert II, 909 F.3d at 345–46.

## II.

The ruling that causes Mr. St. Hubert to lose his direct appeal is mandated by this court's habeas jurisprudence.  For that reason, my discussion will include a brief overview of the remedies available to inmates who are years into serving a long sentence, which they believe should be shortened due to a recent development in the law.  Generally, a prisoner suffering under a sentence he contends is illegal must seek relief by way of motion authorized under 28 U.S.C. § 2255.  However, the Antiterrorism and Effective Death Penalty Act of 1996 renders this quite a narrow path to relief.  For example, prisoners are generally given one chance to collaterally attack their sentence as a matter of right, and this they must do within one year of when it became final.  28 U.S.C. § 2255(f)(1).  For inmates like Mr. St. Hubert, who have been sentenced to serve decades-long terms in prison, this one-time right to review comes too soon.  Almost always, the law that defined and governed an inmate's sentence when it was imposed develops and evolves during his many years behind bars.  Even so, those prisoners who already filed a § 2255 motion within the one-year permitted by statute are strictly limited in their ability

64

to bring to the courts any legal issue that later developed regarding their sentence. For starters, these inmates cannot file another motion (a "second or successive" motion, by the terms of the statute) without getting permission from this Court. See 28 U.S.C. § 2255(h).

And the statute governing this "get permission" process is quite specific. It directs that "[a] motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals." 28 U.S.C. § 2244(b)(3)(B). Also, "[t]he court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection." 28 U.S.C. § 2244(b)(3)(C). The statute sets a time-limit for this authorization: "[t]he court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion." 28 U.S.C. § 2244(b)(3)(D). And although the statute does not expressly prohibit briefing in this context, the panel must rule within the 30-day time limit, so briefing is nearly impossible. Indeed, the statute makes no provision for the government having custody of the prisoner to even know that the inmate applied to file a second or successive petition. Returning to the statute, its remaining provision removes every possible avenue for the appeal of this "prima facie" determination: "[t]he grant or denial of an authorization to file a

65

second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E). From my point of view, it is this prohibition on review that most invites abuse.

The language of this statute simply does not authorize courts of appeal to make merits decisions about the correctness of an inmate's sentence when he is merely seeking permission to file a habeas petition in District Court. A panel presented with a second or successive application is not empowered by the statute to decide in the first instance whether an inmate is entitled to relief. I agree with Judge William Pryor that where Supreme Court or existing Eleventh Circuit precedent already obviously forecloses a prisoner's claim, we should deny his application. But where there is an open merits question, the statute calls for the case to go to the District Court for consideration of that question in the first instance.

I offer the example of a case brought by a man named Stony Lester, because it illustrates how our get-permission process should operate. See In re Stoney Lester, No. 16-11730-A, slip op. Mr. Lester sought leave to file a second or successive § 2255 motion in light of the Supreme Court's holding in Johnson. He sought to challenge his Sentencing Guideline-based, career-offender designation as unconstitutionally vague. Lester, No. 16-11730, slip op. at 2. Even though the

panel disagreed about whether Mr. Lester would ultimately succeed on his claim, it granted his application. Id. at 9. The panel explained it wasn't entirely clear whether Eleventh Circuit precedent foreclosed Mr. Lester's claim. See id. at 4–5 (discussing whether prior precedent that would have foreclosed the claim had been abrogated by decisions of the Supreme Court). Without clear precedent dictating the outcome of Mr. Lester's case, and because the panel recognized that at the application stage, "we do not hear from the government, the application lacks a meaningful opportunity to brief the merits of his case, we have no record, and we do not have the time necessary to decide anything beyond the prima facie question," the panel sent the case to the District Court so it could take the first pass at answering the thorny, open question Mr. Lester's case presented. Id. at 5 (quotations marks and citations omitted).

Two judges on the panel authored concurrences to that order. Judge William Pryor stated Mr. Lester had "made a prima facie showing that he is entitled to relief and that the district court, with the assistance of adversarial briefing must address the merits in the first instance." But Judge Pryor "wrote separately to express [his] view that [Mr.] Lester [wa]s likely not entitled to relief." Id. at 10 (William Pryor, J., concurring in result only). He did not, I note, "collapse[]" the distinction between Mr. Lester's prima facie showing and his case on the merits. William Pryor, J., concurring op. at 35. Judge Jill Pryor also fully

67

concurred in the order granting Mr. Lester's application. Lester, No. 16-11730, slip op. at 13 (Jill Pryor, J., concurring). She also wrote separately, but she explained why she believed Mr. Lester might be entitled to relief. Mr. Lester's panel properly acted as a gatekeeper, sending his case to the District Court to interpret our precedent, intervening Supreme Court decisions, and the disparate views of the two Judge Pryors.

Unfortunately, our Court has not proceeded in this manner for all of these cases. In considering hundreds of applications (particularly since the Supreme Court decided Samuel Johnson's case, Johnson v. United States, 576 U.S. __, 135 S. Ct. 2551 (2015)), this Court has denied authorization to prisoners who plainly made out a prima facie case that they could meet the requirements of the statute, based on the panel's view that the prisoner would later lose on the merits anyway. See In re McCall, 826 F.3d 1308, 1311–12 (11th Cir. 2016) (Martin, J., concurring) (describing "[o]ur court's massive effort to decide the merits of hundreds of habeas cases within 30 days each, all over the span of just a few weeks" in the wake of the Supreme Court's decision rendering Johnson retroactive). These merits decisions are in direct violation of the text of § 2244(b)(3)(C), which vests the three-judge panels reviewing these applications with power only to "determine[]" that the prisoner has made a prima facie showing.

A "prima facie" showing is nothing more than a showing "[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue." Prima Facie, Black's Law Dictionary (10th ed. 2014); see also Prima Facie Case, Black's Law Dictionary (10th ed. 2014) (defining prima facie case as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor."). "Prima Facie" is a term often used in the law, most familiarly in the employment context, and it ordinarily refers to an initial showing of a meritorious claim. See Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094 (1981) (describing the burden of establishing a prima facie case of employment discrimination as "not onerous"). Plainly the party making the prima facie showing is not required to show he has a winning case. He need only show enough to allow a preliminary determination that he could prevail, subject to further proof.

There are many contexts in which courts evaluate whether a case deserves to proceed on the merits by requiring a party to make a prima facie showing. For example, in the context of jury selection, a party can make a prima facie showing of "purposeful racial discrimination" by demonstrating "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson v. Kentucky, 476 U.S. 79, 93–94, 106 S. Ct. 1712, 1721 (1986). This prima facie

69

showing then shifts the burden to the other side to "demonstrate that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Id. (quotation marks omitted). And only if a neutral reason is offered does the trial court analyze the merits. See id. at 98, 106 S. Ct. at 1724; cf. Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995) (holding a Court of Appeals erred by combining Batson's second and third steps). Thus, the merits question of whether a party engaged in racial discrimination when it selected a jury simply cannot be answered based on the prima facie showing alone. But of course in this context there is an opportunity for adversarial testing. And if a court were to overstep its authority by making a merits decision at the "prima facie showing" stage, the offended party can point out the error to that court or on appeal. Not so for an inmate erroneously forced to prove his merits case at the "get permission" stage.

Similarly, in employment cases, the prima facie showing is a tool for distributing the burden for producing evidence. A court considering claims of workplace discrimination first looks to the person alleging discrimination to show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII." Young v. United Parcel Service, Inc., 575 U.S. __, 135 S. Ct. 1338, 1354 (2015) (quotation marks omitted). Once

this prima facie showing—not an onerous one—is made, the burden shifts to the employer to offer a nondiscriminatory reason for the employment action. See id. (quotation marks omitted). Again here, even though some adversarial testing can occur, courts are not allowed to cut off the search for truth once the prima facie showing has been made. And here too, courts that force a merits decision at the prima facie evaluation stage can be challenged on rehearing and on appeal. Not so for inmates seeking to file a second or successive petition, however, because § 2244(b)(3)(E) does not provide them such recourse.

Judge William Pryor argues that my reference to these examples is misplaced because 28 U.S.C. § 2255, unlike Batson or employment discrimination challenges, does not implicate a burden shifting framework. William Pryor, J., concurring op. at 25–27. But his fine distinction is too fine. The general principle that a prima facie showing exists separate and apart from a final determination of the merits applies with equal force to non-burden shifting schemes.

For example, a petitioner in the immigration context is required to make a prima facie showing when she is seeking to reopen either her asylum case; a withholding of removal ruling; or a waiver of inadmissibility ruling. And the Board of Immigration Appeals ("BIA") has long made clear that these types of relief "will not be granted unless the [petitioner] establishes a prima facie case of eligibility for the underlying relief sought." In re S-V-, 22 I. & N. Dec. 1306, 1307

71

(BIA 2000), disapproved on other grounds by Amir v. Gonzales, 467 F.3d 921, 927 (6th Cir. 2006). The "prima facie showing" sufficient to reopen proceedings is one that makes the petitioner's case seem "worthwhile" of further development. In re L-O-G-, 21 I. & N. Dec. 413, 419 (BIA 1996). More to the point, the BIA has explicitly cautioned that "[i]n considering a motion to reopen, the [BIA] should not prejudge the merits of a case before the alien has had an opportunity to prove the case." Id. The BIA has expressed its concern that "[f]requently, it will be difficult to assess from motion papers alone what . . . will occur . . . in a given case." Id.

This concern is real for Mr. St. Hubert's appeal too. He presents important (and certainly impactful) questions about whether his prior convictions for Hobbs Act Robbery and attempted Hobbs Act Robbery qualify as crimes of violence (as that term is used in 18 U.S.C. § 924(c)) so as to require his 32-year sentence. This Court did not decide these questions in the regular order. In ruling against Mr. St. Hubert on these questions, the panel relied upon rulings made under the limited authority of § 2244(b)(3), instead of allowing the full and adversarial testing his arguments deserve on his direct appeal. Some time ago, a three-judge panel of this Court, without adversarial briefing, under a 30-day deadline, and in a process not subject to standard appeal or review, held that a Hobbs Act robbery conviction qualifies as a crime of violence under § 924(c)'s use-of-force clause. In re Saint Fleur, 824 F.3d 1337, 1340–41 (11th Cir. 2016) (per curiam); see also In re Colon,

72

826 F.3d 1301, 1305 (11th Cir. 2016) (per curiam) (relying on Saint Fleur to conclude that aiding and abetting Hobbs Act robbery qualifies as a crime of violence under § 924(c)'s use-of-force clause). This Court's decisions on whether attempted Hobbs Act robbery constitutes a crime of violence suffer from other shortcomings, well-articulated by Judge Jill Pryor in her dissent. Jill Pryor, J., dissenting op. at 86–90.

There was a time when this Court honored the statutorily imposed limitations of a prima facie review. In In re Holladay, 331 F.3d 1169 (11th Cir. 2003), a decision that is still binding precedent for our Circuit, we said the "requisite showing" was "a sufficient showing of possible merit to warrant a fuller exploration by the district court." Id. at 1173–74 (quotation marks omitted) (adopting the standard set in Bennett v. United States, 119 F.3d 468, 469 (7th Cir.1997)); see also Cohen v. Office Depot, Inc., 204 F.3d 1069, 1072 (11th Cir. 2000) ("[W]here two prior panel decisions conflict we are bound to follow the oldest one."). Other courts agree that the standard for allowing a second or successive petition should be interpreted permissively and should not involve a merits analysis of the claim by the Court of Appeals. See In re Hoffner, 870 F.3d 301, 308 (3d Cir. 2017) (explaining that whether an application "relies on" a new rule cannot be based on "whether the claim has merit, because [the Third Circuit] does not address the merits at all in our gatekeeping function"); Ochoa v. Sirmons,

485 F.3d 538, 541 (10th Cir. 2007) (per curiam) ("This statutory mandate does not direct the appellate court to engage in a preliminary merits assessment. Rather, it focuses our inquiry solely on the conditions specified in § 2244(b) that justify raising a new habeas claim."); see also Holladay, 331 F.3d at 1173 ("[I]f in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application" (quotations omitted and alterations adopted)). The proper view is that in deciding whether to allow a second or successive petition, the three-judge panel is not empowered to speculate about what a District Court might do if the second or successive motion is allowed to proceed.

I view the Eleventh Circuit as having routinely exceeded its statutory mandate in this regard. Notwithstanding the narrowness of the inquiry authorized by the language of § 2244, this Circuit has regularly and unnecessarily reached beyond the questions of whether an inmate's request to file a § 2255 motion "contain[s]" a new rule, 28 U.S.C. § 2255(h), and whether he has made a "prima facie showing" to instead address the merits of his claim. Specifically, after receiving hundreds of applications seeking relief based on the Supreme Court's decision in Johnson v. United States, 576 U.S. ___, 135 S. Ct. 2551, "[t]he judges of this court, myself included, [started] combing through sealed records from the

74

prisoner's original sentencing hearing and . . . mak[ing] a decision about whether the prisoner w[ould] win if we let him file his § 2255 motion in district court." In re Clayton, 829 F.3d 1254, 1257 (11th Cir. 2016) (Martin, J., concurring). Later, we codified this approach. See In re Thomas, 823 F.3d 1345, 1349 (11th Cir. 2016) (per curiam) (concluding an applicant failed to make a prima facie showing under § 2255 because the sentencing record indicated the District Court did not rely on the portion of the Armed Career Criminal Act invalidated in Johnson); see also Beeman v. United States, 871 F.3d 1215, 1221 & n.1 (11th Cir. 2017) (expressly adopting Thomas as providing the relevant approach to analyzing § 2255 motions brought pursuant to Johnson). To reiterate, In re Thomas was an opinion of great consequence for our Circuit and for people sentenced to prison terms here. Yet its holding was beyond the ability of the inmate to challenge. See 28 U.S.C. § 2244(b)(3)(E).

This Court has now issued hundreds of rulings on the merits of prisoners' claims in the context of their mere application to proceed in District Court. Before Mr. St. Hubert's appeal was decided, this Court published, by my count, eight opinions resolving, on review of an application to file a second or successive § 2255 motion, the important and often difficult question of whether certain offenses are "crime[s] of violence" or "violent felon[ies]" under the elements clauses in § 924(c)(3)(A), (e)(2)(B)(i), or United States Sentencing Guidelines

75

§ 4B1.2(a).  See In re Welch, 884 F.3d 1319, 1323–25 (11th Cir. 2018) (per

curiam) (Alabama first degree robbery and Alabama first degree assault); In re

Hines, 824 F.3d 1334, 1337 (11th Cir. 2016) (per curiam) (bank robbery in

violation of 18 U.S.C. § 2113(a), (d)); Saint Fleur, 824 F.3d at 1341 (Hobbs Act

robbery); Colon, 826 F.3d at 1305 (aiding-and-abetting Hobbs Act robbery); In re

Smith, 829 F.3d 1276, 1280–81 (11th Cir. 2016) (per curiam) (carjacking in

violation of 18 U.S.C. § 2119); In re Watt, 829 F.3d 1287, 1289–90 (11th Cir.

2016) (per curiam) (aiding and abetting assault of a postal employee); In re Sams,

830 F.3d 1234, 1239 (11th Cir. 2016) (per curiam) (bank robbery in violation of 18

U.S.C. § 2113(a)); In re Burgest, 829 F.3d 1285, 1287 (11th Cir. 2016) (per

curiam) (Florida manslaughter and kidnapping).  Now in standing behind St.

Hubert II, this Court has institutionalized these appeal-proof panel opinions as the

precedent of this Circuit.  It is notable that some of these opinions decided the

merits of claims in the face of dissents by my colleagues and me warning that the

heavily abridged second or successive application procedures are ill-suited to

answering such questions.  See, e.g., Colon, 826 F.3d at 1308 (Martin, J.,

dissenting) ("Deciding the merits of not-yet-filed § 2255 motions in this way is

especially dangerous in cases like Mr. Colon's that turn on a complex question of

first impression."); Smith, 829 F.3d at 1285 (Jill Pryor, J., dissenting) ("We

certainly have never held that the [carjacking] statute would qualify categorically

76

even setting aside the residual clause in § 924(c).  It would be impractical and imprudent to decide this complex question in the first instance here.").  Outside of the second or successive application setting, our Court rules would ordinarily require an oral argument panel to consider a topic upon which the panel could not reach unanimity.  11th Cir. R. 34-3(b)(3).

## III.

In his concurrence, Judge Tjoflat attempts to mitigate the extent of the harm from this practice by saying that only a few of the orders deciding the merits of claims presented in second or successive applications have been published. Tjoflat, J., concurring op. at 11.  But it is not the number of published opinions I take issue with.  I take issue with the practice itself.  As Mr. St. Hubert's case illustrates, any one published order that prematurely and in my view mistakenly resolves an open merits question forecloses that issue for all future panels.  See Ovalles v. United States, 905 F.3d 1231, 1268 (11th Cir. 2018) (Martin, J., dissenting) (describing the outsized effect of a few published second or successive application rulings that resolved open questions of law).  No critical mass of published merits orders is necessary to establish the law in our Circuit and affect hundreds of inmates.

Take for example In re Smith, which held for the first time that carjacking in violation of 18 U.S.C. § 2119 "clearly" qualifies as a crime of violence under

§ 924(c)'s use-of-force clause.  829 F.3d at 1280–81.  As Judge Jill Pryor explained in a dissent to that decision, the Smith majority's conclusion was hardly obvious and only tenuously supported by our prior case law.  In re Smith, 829 F.3d 1276, 1281–85 (11th Cir. 2016) (Jill Pryor, J., dissenting).  Nevertheless, the rule set out in Smith became the rule in this Circuit.  All later panels considering denials of § 2255 motions and requests for authorization to file second or successive § 2255 motions must rely on Smith—as our prior panel precedent rule mandates—to decide the same issue.  See, e.g., Grant v. United States, 694 F. App'x 756, 758 (11th Cir. 2017) (unpublished) (mem.) ("Grant's argument that carjacking is not a crime of violence under § 924(c)'s force clause is foreclosed by our opinion in Smith.  Therefore, Grant's convictions under § 924(c) were proper because carjacking satisfies § 924(c)'s force clause, and the district court did not err in denying his § 2255 motion to vacate on this ground.").  It is not the number of published orders that thwarts defendants' efforts to have our Court fully consider their claims, it is the breadth of their reach.

Judge Tjoflat says my dissenting colleagues and I engage in the very practice we criticize, because we have been on panels that published certain orders on prisoners' applications to file second or successive § 2255 motions.  Tjoflat, J., concurring op. at 14–15.  But not one of the 14 orders he points to resolved for the first time a then-open question about whether a certain offense qualifies as a crime

78

of violence or a violent felony under the elements clause of § 924(c)(3)(A), (e)(2)(B)(i), or United States Sentencing Guidelines § 4B1.2(a).  None of our opinions bound future panels to grant relief to any prisoner based on their criminal history.  To the contrary, eight of the fourteen orders denied the prisoner relief based on a straightforward application of existing Circuit precedent.  In re Hunt, 835 F.3d 1277 (11th Cir. 2016); In re Parker, 832 F.3d 1250 (11th Cir. 2016); In re Jones, 830 F.3d 1295 (11th Cir. 2016); In re Clayton, 829 F.3d 1254 (11th Cir. 2016); In re Sapp, 827 F.3d 1334 (11th Cir. 2016); In re McCall, 826 F.3d 1308 (11th Cir. 2016); In re Rogers, 825 F.3d 1335 (11th Cir. 2016); In re Robinson, 822 F.3d 1196 (11th Cir. 2016).  Six of those eight published orders featured at least one concurrence that offered criticism of the Circuit's existing precedent the panel was compelled to apply.  See, e.g., In re Hunt, 835 F.3d 1277, 1279 (11th Cir. 2016) (Wilson, J., concurring) ("Although Hunt's Guidelines-based claim is currently foreclosed by [United States v.] Matchett, I write separately to explain why I disagree with the holding in Matchett."); In re Parker, 832 F.3d 1250, 1250–51 (11th Cir. 2016) (Rosenbaum, J., concurring) ("I agree that In re Baptiste requires us to dismiss Leslie Parker's request for authorization to file a second or successive habeas petition.  I write separately because I continue to believe that Baptiste's interpretation of 28 U.S.C. 2244(b)(1) . . . is incorrect as a matter of law." (citation omitted)); In re Jones, 830 F.3d 1295, 1297–1305 (11th Cir. 2016)

(Rosenbaum, J., concurring) (offering four reasons why <u>Baptiste</u>, the decision that precluded the prisoner's request for relief, was wrongly decided); <u>In re Clayton</u>, 829 F.3d 1254, 1256–76 (11th Cir. 2016) (Martin, J., concurring) (criticizing <u>Matchett</u>, which precluded the prisoner's request for relief); <u>In re Sapp</u>, 827 F.3d 1334, 1337 (11th Cir. 2016) (Jordan, Rosenbaum, & Jill Pryor, JJ., concurring) ("Although we are bound by <u>Griffin</u>, we write separately to explain why we believe <u>Griffin</u> is deeply flawed and wrongly decided."); <u>In re McCall</u>, 826 F.3d 1308 (11th Cir. 2016) (Martin, J., concurring) (criticizing <u>Griffin</u> and <u>Matchett</u>, which precluded the prisoner's request for relief).

The remaining six orders cited by Judge Tjoflat granted the prisoners' applications but did not decide the merits question. We sent the prisoners' cases to the District Court to resolve the unsettled merits question in the first instance. <u>In re Chance</u>, 831 F.3d 1335 (11th Cir. 2016); <u>In re Gomez</u>, 830 F.3d 1225 (11th Cir. 2016); <u>In re Davis</u>, 829 F.3d 1297 (11th Cir. 2016); <u>In re Parker</u>, 827 F.3d 1286 (11th Cir. 2016); <u>In re Adams</u>, 825 F.3d 1283 (11th Cir. 2016); <u>In re Pinder</u>, 824 F.3d 977 (11th Cir. 2016). For example in <u>Pinder</u>, we explained "the law [was] unsettled on whether the rule announced in <u>Johnson</u> invalidates Pinder's sentence," but "[w]hat's clear however is that Pinder has made a prima facie showing that his motion contains a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." 824 F.3d at 979 (omission adopted,

80

quotation marks omitted, citation omitted). These orders are simply different than the published orders that resolved open merits questions.

Judge Tjoflat also writes that St. Hubert II merely echoed an already-clear rule in our Circuit about how to treat published orders resolving requests for authorization to file a second or successive § 2255 motion. Tjoflat, concurring op. at 16. But the St. Hubert II panel opinion tells us this is not so. St. Hubert II decided, once and for all, that merits decisions reached in the second or successive application context are binding precedent on direct appeal. 909 F.3d at 346 ("Lest there be any doubt, we now hold in this direct appeal that law established in published three-judge orders issues pursuant to 28 U.S.C. § 2244(b) in the context of applications for leave to file second or successive § 2255 motions is binding precedent on all subsequent panels of this Court, including those reviewing direct appeals and collateral attacks, unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." (alteration adopted, quotation omitted, citation omitted)). This decision has great consequence. It curtails our review of claims made by prisoners like Mr. St. Hubert, even on direct appeal.

His criticisms aside, Judge Tjoflat seems to acknowledge our Court has reached beyond merely determining whether an application to file a second or successive § 2255 motion makes the required prima facie showing. He notes for

81

example a series of orders in which "this Court determined that Johnson's residual clause holding did not apply to companion § 924(c) crimes and that, even assuming Johnson did, the prisoners' crimes qualified under § 924(c)'s elements clause, which likewise was not affected by Johnson." Tjoflat, J., concurring op. at 11. Judge Tjoflat also recognizes that "[i]n 2016 after the Johnson and Welch decisions, there was a heightened need to publish at least some of these 2,282 orders to establish precedent." Id. at 13. Both of these points demonstrate rather than refute my view. I know of no reason why these published opinions should not have been the product of the usual robust process that ordinarily attends our Circuit precedent.

Judge Tjoflat and I disagree on the upshot of this overreach, however. While he may find it comforting that we've exceeded Congress's mandate only sparingly, I do not. Neither do I believe our Court can justify our overreach because the merits decisions we make in this context might match those made by other Circuits after more thorough review. In the same way, I do not share Judge Tjoflat's apparent comfort that we have our Staff Attorney's Office give us advice on merits issues better left to U.S. District Judges to decide. See Tjoflat, J., concurring op. at 14, 21. Finally in this regard, I take no comfort in the backstop of a sua sponte en banc call by an active member of this Court. See id. at 18. This process would require a member of this Court to identify a wrongly decided merits

82

order for which no petition for rehearing en banc has been filed; succeed in an en banc call; and persuade the full en banc court to reverse the panel decision. And this is a process the prisoner cannot himself initiate and generally is excluded from participating. I do not disagree with Judge Tjoflat when he says about us that "[t]he real problem for the dissenters" is that we "have not garnered the majority votes needed to vacate the particular published panel orders with which [we] disagree." Id. at 17. But just because we hold a minority of the positions on this court does not necessarily mean we are wrong.

## IV.

The members of this court are bound to treat the St. Hubert II panel's holdings as binding precedent in this Circuit, unless and until the Supreme Court or this Court sitting en banc reverses each of them, one by one. See United States v. Archer, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining that, under this Circuit's prior panel precedent rule, this Court is bound to follow a prior panel's holding unless it has been overruled or undermined to the point of abrogation by our en banc Court or by the Supreme Court). Nothing in the limited § 2255 authorization procedure was designed for resolving whether a given offense qualifies as a crime of violence or violent felony. See Wilson, J., dissenting op. at 53–56 (describing the limited nature of § 2255 authorization procedures). This Court unnecessarily and prematurely addressed these issues and, in so doing, exceeded its statutory

83

mandate.  As a result, prisoners sentenced in Alabama, Florida and Georgia may be serving illegal sentences for which they have no remedy.

Congress gave us a gatekeeping function.  We've used it to lock the gate and throw away the key.  The full court should have taken up this matter of great consequence.  I dissent from its decision not to do so.

JILL PRYOR, Circuit Judge, with whom WILSON and MARTIN, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join in full Judge Wilson's and Judge Martin's compelling dissents. The institutional (and, possibly, constitutional) problems with treating published panel orders as binding on all subsequent panels are significant and, at a minimum, worthy of en banc review. I write separately to express my disagreement with the panel opinion's holding that an attempt to commit an offense that qualifies under 18 U.S.C. § 924(c)'s elements clause itself necessarily constitutes an elements clause offense.

The statute at issue in Mr. St. Hubert's case, 18 U.S.C. § 924(c), criminalizes and imposes mandatory enhanced sentences for using or carrying a firearm "during and in relation to any crime of violence or drug trafficking crime" or possessing a firearm in furtherance of such a crime. 18. U.S.C. § 924(c)(1)(A). Section 924(c)(3) defines "crime of violence" as "an offense that is a felony and":

> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

*Id.* § 924(c)(3). Subsection (A) is known as the "elements clause," and subsection (B) is known as the "residual clause."

The panel opinion considered whether Mr. St. Hubert's conviction for attempted Hobbs Act robbery qualified as a violent felony under 18 U.S.C. § 924(c)'s elements clause. *See United States v. St. Hubert*, 909 F.3d 335, 351-53 (11th Cir. 2018). An individual commits Hobbs Act robbery when he "obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery . . . or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to" commit robbery under the statute. 18 U.S.C. § 1951(a). "[R]obbery," in turn, is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future." *Id.* § 1951(b)(1). Under federal law, to be convicted for an attempt crime, the defendant must (1) have the specific intent to engage in the criminal conduct he is charged with attempting and (2) engage in an overt act, defined as "a substantial step toward the commission of that crime and which strongly corroborates [his] criminal intent." *United States v. Rothenberg*, 610 F.3d 621, 626 (11th Cir. 2010); *see also United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004).

The panel opinion concluded that attempted Hobbs Act robbery qualifies as a predicate offense under § 924(c)'s elements clause.[1] *See St. Hubert*, 909 F.3d at 352. To get to that conclusion, the opinion made two right turns before it took a wrong turn, but the wrong turn led to a logical and legal dead end. First, the opinion said, "the definition of a crime of violence in [the elements clause] equates the use of force with attempted force, and thus the text of [the elements clause] makes clear that actual force need not be used for a crime to qualify" as a crime of violence. *Id.* No disagreement here. Second, "a completed Hobbs Act robbery itself qualifies as a crime of violence under [§ 924(c)'s elements clause] and, therefore, attempt to commit Hobbs Act robbery requires that St. Hubert intended to commit every element of Hobbs Act robbery, including the taking of property in a forcible manner." *Id.* That is because "a defendant must intend to commit every element of the completed crime in order to be guilty of attempt." *Id.* So far so good.

But then the opinion concluded: "'[A]n attempt to commit a crime should be treated as an attempt to commit every element of that crime'"; thus, "when a substantive offense qualifies as a violent felony under [§ 924(c)'s elements clause],

---

[1] I do not address the opinion's alternative holding that Mr. St. Hubert's attempted Hobbs Act robbery conviction falls within § 924(c)'s residual clause, a holding that rested upon the en banc Court's decision in *Ovalles v. United States*, 905 F.3d 1231 (11th Cir. 2018) (en banc). *See St. Hubert*, 909 F.3d at 346-47. I dissented in that case, *see Ovalles*, 905 F.3d at 1277-99 (Jill Pryor, J., dissenting), and continue to disagree with its holding and reasoning.

87

an attempt to commit that offense also is a violent felony." *Id.* (quoting *Hill v. United States*, 877 F.3d 717, 719 (7th Cir. 2017)). This is where the panel opinion (and the *Hill* opinion upon which it relied) went wrong. Logic permits no inference from the fact of a conviction for an attempt crime that the person attempted to commit every element of the substantive offense. The panel was able to bridge this logical gap only by converting *intent* to commit each element of the substantive offense (proof of which is necessary to convict someone of an attempt crime) into *attempt* to commit each element of the substantive offense (which is not necessary to convict someone of an attempt crime). *Intending* to commit each element of a crime involving the use of force simply is not the same *attempting* to commit each element of that crime. By the alchemy of transmuting intent to commit each element into attempt to commit each element, the panel conjured the conclusion that anyone convicted of an attempt to commit a crime involving force must have been found beyond a reasonable doubt to have attempted to use force. That's the logical flaw.

Now the legal flaw: the panel's transformation of an attempted offense into an attempt to commit each element of the offense does not align with the actual elements of an attempt offense. *Rothenberg*, 610 F.3d at 626; *Murrell*, 368 F.3d at 1286. So it is incorrect to say that a person necessarily attempts to use physical

88

force within the meaning of § 924(c)'s elements clause just because he attempts a crime that, if completed, would be violent.

Conviction for an attempt crime also requires an overt act, but that element does not fill the panel opinion's logical gap. We can easily imagine that a person may engage in an overt act—in the case of robbery, for example, overt acts might include renting a getaway van, parking the van a block from the bank, and approaching the bank's door before being thwarted—without having used, attempted to use, or threatened to use force. Would this would-be robber have *intended* to use, attempt to use, or threaten to use force? Sure. Would he necessarily have attempted to use force? No. So an individual's conduct may satisfy all the elements of an attempt to commit an elements-clause offense without anything more than intent to use elements-clause force and some act (in furtherance of the intended offense) that does not involve the use, attempted use, or threatened use of such force. The panel opinion's conclusion that an attempt to commit a crime of violence necessarily is itself a crime of violence simply does not hold up.

By declining to rehear this case en banc, our court not only ignores the serious institutional concerns my colleagues describe in their dissents, but it also misses the chance to reexamine the panel's flawed logic as to attempt crimes. This missed opportunity perpetuates unlawfully lengthy sentences for people convicted

89

of attempt crimes.  And the panel opinion's erroneous holding reaches beyond § 924(c) because this court already has applied that holding to the Armed Career Criminal Act, which increases the sentence for any person convicted of being a felon in possession of a firearm who has three prior convictions for violent felonies or serious drug offenses.  *See Hylor v. United States*, 896 F.3d 1219, 1223 (11th Cir. 2018) (majority opinion); *id.* at 1224-27 (Jill Pryor, J., concurring in result) (making essentially the same argument I make today).

District courts within our circuit lead the pack in imposing sentences under these enhancement statutes.[2]  It is critically important that we of all circuits get this right.  I dissent from the denial of rehearing en banc.

---

[2] In 2016—the last year for which the United States Sentencing Commission has reported complete data—only the Fourth Circuit's district courts handed down more sentences under § 924(c) than ours did.  *See* United States Sentencing Comm'n, *Mandatory Minimum Penalties for Firearms Offenses in the Federal Criminal Justice System* 72-74 (2018).  That same year, district courts within our circuit imposed more sentences enhanced under the Armed Career Criminal Act than any other circuit.  *Id.* at 36 (reporting that in 2016 the Eleventh Circuit's district courts handed down 26.6% of ACCA-enhanced sentences, by far the most of any circuit).